644 A.2d 522

**Elizabeth L. WOLF**

v.

**Harry M. FORD, Jr. et al.**

**No. 104, Sept. Term, 1993.**

Court of Appeals of Maryland.

July 18, 1994.

526

Frank E. Trock (Charles B. Zuravin, Charles B. Zuravin, P.A., all on brief), Columbia, for appellant.

Andrew J. Bowden (Legg Mason Wood Walker, Inc., all on brief), Stuart R. Berger (Weinberg and Green, all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

KARWACKI, Judge.

In this case we focus upon the enforceability of an exculpatory clause in an agreement between an investor and a securities investment firm. The clause at issue provides that the investment firm will not be liable for losses to the investor resulting from the firm's negligence, but only for those losses resulting from its gross negligence or wilful misconduct. Under the circumstances of the instant case, we shall enforce the

exculpatory clause. Viewing the evidence and all inferences therefrom in a light most favorable to Elizabeth Wolf, the appellant, the following facts were established at trial.

In April, 1986, the eighteen-year-old appellant received $145,700 in settlement of a lawsuit she had filed to recover damages for injuries arising out of a 1983 automobile accident. On April 2, 1986, Wolf and her mother visited the home of the appellee, Harry M. Ford, who at the time was employed as a stockbroker at the investment firm of the appellee, Legg Mason Wood Walker, Inc. ("Legg Mason"). The purpose of the meeting was to discuss Wolf's options for investing the money she had received from the settlement. At the meeting, Wolf told Ford that her goals were to get a college education and to preserve the bulk of her money. She testified that she told Ford, "I don't want it to flitter away, it was something I wanted to hold on to."

The following day, Ford sent Wolf a letter stating that he was looking forward to working with Wolf in her investments. The letter contained three enclosures that Wolf was to sign and return to Ford; among the enclosures was a Discretionary Account Agreement.[1] The Agreement provided in pertinent part:

"You are hereby authorized to buy, sell and generally trade in securities, on margin, in cash or otherwise in accordance with your terms and conditions for my account and risk.

. . . .

". . . I hereby exonerate you from any and all liability for losses which may occur while you are acting on my behalf except for such as may result from your gross negligence or willful misconduct."

. . . .

"I hereby reserve the power to direct and terminate at any and all times the selection of securities for purchase or

---

1. A Discretionary Account Agreement is a document that delegates to the stockbroker the ability to trade securities on behalf of the accountholder without seeking the advance permission of the accountholder.

sale, but the exercise of such power shall not be deemed a revocation of this agreement, the same to remain in full force and effect until revoked by me by written notice addressed to you ... but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation."

Wolf signed this Agreement on April 7, 1986 and returned it to Legg Mason. On April 15, 1986, Legg Mason received $135,-000.00 from Wolf.[2] Ford used this money to purchase 22 different stocks for Wolf's portfolio.

Later that same year, Wolf began to withdraw large sums of cash from her account with Legg Mason. In August, 1986, Wolf withdrew $8,000.00. In October and November, 1986, she withdrew a total of $4,500.00. In December, 1986, she withdrew $500.00. In January, 1987, she withdrew $6,000.00.

In July, 1987, Wolf received a letter from C.A. Bacigalupo, a senior vice president of Legg Mason, which stated:

"As a service to our clients, we periodically review discretionary authorizations at Legg Mason Wood Walker, Inc. This enables us to verify that the authority is to continue.

"It is requested that you sign and return this letter indicating whether or not you wish to continue the discretionary authority which you conferred upon your investment broker.... If we do you hear from you by August 7, 1987, the discretionary authority will be terminated."

Wolf signed the letter on September 4, 1987, indicating on the letter that she wished to continue the discretionary authorization. In November and December, 1988, Wolf withdrew $5398.44. In January, 1989, she withdrew over $5,200.00. During the time her account was handled by Ford, she withdrew a total of $64,650.00 from her account. Each withdrawal required the prompt sale of one or more of the stocks from her portfolio.

Apparently upset with the performance of some of the stocks in her portfolio, Wolf called Legg Mason in June, 1990

---

2. Wolf kept approximately $10,000 of her settlement to buy an automobile.

and terminated the discretionary authority she had given Ford. In August, 1990, she instructed Legg Mason to transfer her account from Ford to John Seifert, another stockbroker at Legg Mason. Wolf closed her account with Legg Mason in March, 1991.

Wolf filed suit in the Circuit Court for Baltimore County against Ford, Seifert, and Legg Mason in May, 1992. Seifert was voluntarily dismissed from the case by Wolf prior to trial, and after the close of Wolf's case at a jury trial, the court (Bollinger, J.) granted the defendants' motion for judgment pursuant to Maryland Rule 2–519.[3] The trial judge ruled that the exculpatory clause contained in the Discretionary Account Agreement limited defendants' potential liability to those losses resulting from gross negligence or intentional misconduct. He further ruled that there was no evidence of either gross negligence or wilful misconduct on the part of Ford or Legg Mason and entered judgment in their favor.

Wolf timely noted an appeal to the Court of Special Appeals. We issued a writ of certiorari on our own motion before consideration of the case by the intermediate appellate court to consider the effect of the exculpatory clause in the Discretionary Account Agreement.

## I

Before this Court, Wolf argues that the exculpatory clause contained in the Discretionary Account Agreement is void as

---

**3.** Maryland Rule 2–519 provides in pertinent part:
"**Rule 2–519. MOTION FOR JUDGMENT**
(a) **Generally.**—A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party....
(b) **Disposition.**—When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. When a motion for judgment is made under any other circumstances, the court shall consider the evidence and inference in the light most favorable to the party against whom the motion is made."

against public policy and that the case should therefore be remanded for a determination of the existence of simple negligence on the part of Ford or Legg Mason. We disagree.

■ The late Judge Charles E. Orth, Jr., writing for the Court of Special Appeals, discussed the validity of exculpatory clauses at length in *Winterstein v. Wilcom,* 16 Md.App. 130, 293 A.2d 821, *cert. denied,* 266 Md. 744 (1972). In the absence of legislation to the contrary, exculpatory clauses are generally valid, and the public policy of freedom of contract is best served by enforcing the provisions of the clause. *Id.* at 135, 293 A.2d at 824; 57A Am.Jur.2d, Negligence § 53, at 112 (1989). The rule has also been explained thus:

> "It is quite possible for the parties expressly to agree in advance that the defendant is under no obligation of care for the benefit of the plaintiff, and shall not be liable for the consequences of conduct which would otherwise be negligent. There is in the ordinary case no public policy which prevents the parties from contracting as they see fit...."

W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 68, at 482 (5th ed. 1984). *See also* Comment (a), Restatement, Second, Contracts § 195 (1981) ("a party to a contract can ordinarily exempt himself from liability for harm caused by his failure to observe the standard of reasonable care imposed by the law of negligence").

■ There are circumstances, however, under which the public interest will not permit an exculpatory clause in a contract; these have often been grouped into three general exceptions to the rule. First, a party will not be permitted to excuse its liability for intentional harms or for the more extreme forms of negligence, i.e., reckless, wanton, or gross. *Winterstein,* 16 Md.App. at 136, 293 A.2d at 824; Restatement, Second, Contracts § 195(1); Keeton, *supra.* Second, the contract cannot be the product of grossly unequal bargaining power. "When one party is at such an obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence, the agreement is void as against public policy." *Winterstein,* 16 Md.App. at

135–36, 293 A.2d at 824; Keeton, *supra.* Third, public policy will not permit exculpatory agreements in transactions affecting the public interest. *Winterstein,* 16 Md.App. at 136, 293 A.2d at 824. This last category includes the performance of a public service obligation, e.g., public utilities, common carriers, innkeepers, and public warehousemen. It also includes those transactions, not readily susceptible to definition or broad categorization, that are so important to the public good that an exculpatory clause would be "patently offensive," such that " 'the common sense of the entire community would ... pronounce it' invalid." *Md. Nat'l Cap. P. & P. v. Wash. Nat'l Arena,* 282 Md. 588, 606, 386 A.2d 1216, 1228 (1978), quoting *Estate of Woods, Weeks & Co.,* 52 Md. 520, 536 (1879). This standard is a strict one, in keeping with our general reluctance to invoke the nebulous public interest to disturb private contracts. As we stated in *Md. Nat'l Cap. P. & P., supra:*

> "Fearing the disruptive effect that invocation of the highly elusive public policy principle would likely exert on the stability of commercial and contractual relations, Maryland courts have been hesitant to strike down voluntary bargains on public policy grounds."

282 Md. at 606, 386 A.2d at 1228. *See also Anne Arundel Cty. v. Hartford Accident,* 329 Md. 677, 686–88, 621 A.2d 427, 431–32 (1993); *Finci v. American Casualty,* 323 Md. 358, 376–79, 593 A.2d 1069, 1077–78 (1991).

Because the concept of the "public interest" is amorphous, it is difficult to apply. Courts, therefore, have struggled to refine and narrow the definition in an attempt to make the concept more concrete. *Winterstein* referred to a six-factor test developed by the Supreme Court of California in *Tunkl v. Regents of the Univ. of Calif.,* 60 Cal.2d 92, 383 P.2d 441, 32 Cal.Rptr. 33 (1963) that was intended to determine which exculpatory agreements affect the "public interest" and which do not. *Winterstein* quoted the following passage from *Tunkl,* noting that it is to be used as a rough outline of that type of transaction in which exculpatory provisions will be held invalid:

" 'Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.' "

*Winterstein,* 16 Md.App. at 137, 293 A.2d at 825, quoting *Tunkl,* 60 Cal.2d at 98–101, 383 P.2d at 445–46, 32 Cal.Rptr. at 37–38 (footnotes omitted).

Ten years before *Winterstein* was decided, this Court examined an exculpatory clause in a lease and determined that such clauses are generally valid. *Eastern Ave. Corp. v. Hughes,* 228 Md. 477, 180 A.2d 486 (1962).[4] Since *Winterstein* was

---

4. *Eastern Ave. Corp. v. Hughes,* 228 Md. 477, 180 A.2d 486 (1962), concerned an exculpatory clause contained in a residential lease. We examined the weight of authority from our sister states, and we determined that, absent legislative restrictions, exculpatory clauses were not contrary to public policy and were valid. Soon thereafter, the General Assembly responded by providing exculpatory clauses in real property leases to be against public policy and void. Ch. 124 of the Acts of 1964 (currently codified as Maryland Code (1974, 1988 Repl.Vol.), § 8–105 of the Real Property Article). The legislative restriction, however,

decided, we have not often had the opportunity to consider exculpatory clauses in the absence of statutory provisions governing the clause.[5]  The Court of Special Appeals, however, has considered exculpatory clauses in several matters.  In *Boucher v. Riner*, 68 Md.App. 539, 514 A.2d 485 (1986), the court held enforceable an exculpatory clause signed by a parachute student shortly before he jumped and suffered injuries in his descent.  The following year, the Court of Special Appeals enforced a limitation of damages clause that limited the monetary damages available for negligence in a contract for a burglar alarm system, notwithstanding the fact that personal injury was involved in that case.  *Schrier v. Beltway Alarm Co.*, 73 Md.App. 281, 533 A.2d 1316 (1987).  Even more recently, in *Baker v. Roy Haas Assoc.*, 97 Md.App. 371, 629 A.2d 1317 (1993), the intermediate appellate court upheld a clause in a contract for home inspection services that limited the inspection company's liability for negligence to an amount not to exceed the fee paid for the inspection service.  In each of these cases, the court rejected an assertion that the

---

extends only to agreements between landlord and tenant.  *See Prince Philip Partnership v. Cutlip*, 321 Md. 296, 582 A.2d 992 (1990).

In a more recent attorney disciplinary proceeding involving a breach of an attorney's fiduciary duty to a client's trust, we recognized that exculpatory clauses are valid and will be enforced according to their tenor, subject to few limitations.  *Attorney Griev. Comm'n v. Owrutsky*, 322 Md. 334, 350, 587 A.2d 511, 518 (1991).  *See also Sullivan v. Mosner*, 266 Md. 479, 494–96, 295 A.2d 482, 491 (1972) (a clause purporting to release trustees from any personal responsibility was effective to protect the trustees from liability except for acts committed in bad faith, or intentionally, or with reckless indifference to the interests of the beneficiary, or for any profit that the trustees derived from a breach of the trust).

5.  In addition to the statute prohibiting exculpatory clauses between landlord and tenant, *see* note 4, *supra*, we have also had occasion recently to construe a statute that declares void as against public policy any covenant, promise, agreement or understanding in a construction contract which purports to indemnify the promisee against liability for damages caused by the promisee's sole negligence.  Md.Code (1974, 1989 Repl.Vol., 1993 Cum.Supp.), § 5–305 of the Courts Article; *Heat & Power v. Air Products*, 320 Md. 584, 592–93, 578 A.2d 1202, 1206 (1990); *Bethlehem Steel v. G.C. Zarnas & Co.*, 304 Md. 183, 195, 498 A.2d 605, 611 (1985).

challenged clause was void as against public policy. Each opinion refers to *Winterstein* and its enumeration of the six factors from *Tunkl,* and each attempts to apply the six-factor test loosely.

Even though these cases have not found an activity that is sufficiently connected to the "public interest" so as to invalidate the exculpatory clause, we are concerned that the six-factor test of *Tunkl,* originally intended to be a rough outline in guiding a court's determination as to whether a given transaction affects the public interest, may become too rigid a measuring stick. Because of the fluid nature of the "public interest," strict reliance on the presence or absence of six fixed factors may be arbitrary. The *Tunkl* court itself recognized that the public interest does not—and cannot—lend itself easily to definition, because "the social forces that have led to such characterization [of the public interest] are volatile and dynamic. No definition of the concept of public interest can be contained within the four corners of a formula." *Tunkl,* 60 Cal.2d at 98, 383 P.2d at 444, 32 Cal.Rptr. at 36.

■ We expressly decline, therefore, to adopt the six-factor test set forth in *Tunkl* and relied upon, to varying degrees, by the Court of Special Appeals in the exculpatory clause cases mentioned above. This is not to say that the factors listed cannot be considered by a court in determining whether a given transaction involves the public interest, but the six factors are not conclusive. The ultimate determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations.

## II

■ Turning to the merits of the case *sub judice,* we perceive no reason why the exculpatory clause should not be enforced. None of the three exceptions to the general rule permitting exculpatory clauses is applicable here.

■ First, there has been no allegation of fraud or willful misconduct, and Wolf concedes that there is no evidence of gross negligence. To the contrary, Wolf testified at trial that during the time that Ford handled her account, buying and selling securities for her, Ford never lied to her or made any misrepresentations to her. Second, contrary to Wolf's assertion, we do not believe that there was any disparate bargaining advantage. Wolf claims that the very fact that she was eighteen years old and an unsophisticated investor renders the relationship so lopsided as to impose an extraordinary duty upon Ford. We do not accept that notion. Although young, she had attained her legal majority at the time. She was not solicited by Legg Mason; rather, she initiated contact with Ford. Wolf was under no compulsion, economic or otherwise, to invest her money in the stock market with Legg Mason or any other securities investment firm. She had numerous options available to her, including placing her money in an interest-bearing bank account or long-term certificates of deposit. Moreover, even within Legg Mason, she was under no compulsion to give Ford discretionary authority over her account. Had she wished to retain control over each transaction, she could have received the benefit of Ford's knowledge, experience, and advice, yet still have made every decision on the sale and purchase of individual securities. She, however, signed the Discretionary Account Agreement, including the exculpatory clause, five days after her initial discussion with Ford, and she reiterated her desire to have her account handled on a discretionary basis in September of the following year. Furthermore, even with the Discretionary Account Agreement in place, Wolf did not cede control over her account. According to the terms of the agreement, she retained at all times the right to make investment decisions, to withdraw funds, and to terminate the stockbroker's discretionary authority. Wolf invoked all of these rights during the course of her relationship with Legg Mason.

■ Third, a stockbroker-client relationship is not one that so affects the public interest that we should disturb the parties' ability to contractually exempt a party from liability

for negligence. Wolf argues that we should adopt the six-factor *Tunkl* test for defining the public interest, and that under that test, a stockbroker-client relationship is affected with public interest. We have stated above, however, that we do not adopt the six-factor test as conclusive, and we will not invalidate a private contract on grounds of public policy unless the clause at issue is patently offensive. This clause does not meet that test. Individuals who choose freely to invest their money in the stock market understand that there is some risk involved; such is the nature of the securities industry. If the parties to a contract determine that one party will bear the burden of the other party's simple negligence, they are entitled to do just that. This is particularly important where an account is accepted on a discretionary basis, as in the instant case, and the investor asks the broker to purchase stocks using the broker's best judgment. This is not a case in which an investment is made based upon a broker's misrepresentation. *Cf. Blankenheim v. E.F. Hutton,* 217 Cal.App.3d 1463, 1471–72, 266 Cal.Rptr. 593, 599 (1990) (holding exculpatory clause in investment contract invalid insofar as it attempts to disclaim liability for fraud or misrepresentation). Rather, the possibility of poor performance of the securities chosen is precisely the sort of harm that is within the contemplation of the parties at the time they entered the agreement. Because of the volatile nature of financial markets, what may appear to be negligence in the purchase of securities one year may eventually turn out to be a stroke of genius in following years, and vice versa. Thus, the allocation of risk of negligence between parties to a private contract is not patently offensive; rather, it is part and parcel of the freedom to contract in private matters.[6]

---

6. At oral argument, counsel for Wolf suggested that the stockbroker-client relationship involves the public interest by virtue of the fact that a stockbroker has fiduciary responsibilities to a client. In support of this assertion, counsel attempted to analogize that relationship with the attorney-client relationship, arguing that because attorneys are not permitted to limit their liability for negligence, stockbrokers also should be so bound. We disagree.

We hold, therefore, that the exculpatory clause in the Discretionary Account Agreement between Wolf and Ford is valid and enforceable.

### *JUDGMENT AFFIRMED, WITH COSTS.*

CHASANOW and BELL, JJ., concur in result only.

---

The legal profession is readily distinguished from other professions, as it stands in a unique relationship to the government. A lawyer is "an officer of the legal system and a public citizen having special responsibility for the quality of justice." Preamble, Maryland Rules of Professional Conduct (Appendix, Maryland Rules). An independent, self-regulating legal profession is "an important force in preserving government under law, for abuse of legal authority is more readily challenged by a profession whose members are not dependent on government for the right to practice." *Id.* Nothing is more firmly rooted in the public interest than matters dealing with the governance of the public; the attorney often serves as the conduit for citizens' interaction with their government. The legal profession, with its ability to influence all aspects of citizens' lives, public and private, cannot be separated from the concept of ordered liberty. Thus, the attorney-client relationship is one that is so affected with public interest that generally an attorney cannot require a client to release him or her from liability for future negligence. *See* Rule 1.8(h) of the Rules of Professional Conduct.

Stockbrokers, on the other hand, certainly perform a valuable function in providing individual investors with access to the financial markets and assisting them with the complexities of the markets, but the role of the broker is not intertwined inextricably with the processes of government and justice. Although markets and public securities are strictly regulated, the relationship between an individual broker and an individual investor is primarily private in nature. It is not so closely linked with the public interest that this Court should interfere with brokers' ability to contract freely with their clients, at least as far as an exculpatory clause for negligence is concerned.