

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-20-2008

# Wartsila NSD NA Inc v. Hill Intl Inc

Precedential or Non-Precedential: Precedential

Docket No. 06-3595

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Wartsila NSD NA Inc v. Hill Intl Inc" (2008). *2008 Decisions.* Paper 934.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/934

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-3595

———

WARTSILA NSD NORTH AMERICA, INC.

v.

HILL INTERNATIONAL, INC.,
                                    Third-Party Plaintiff
                            v.

JOHN H. CLEGG, ESQUIRE;
DAPHNE MCNUTT, ESQUIRE;
CHAFFE, MCCALL, PHILLIPS, TOLER & SARPHY, L.L.P.,
                                    Third-Party Defendants

Hill International, Inc.,
                                    Appellant

———

On Appeal from the
United States District Court for the District of New Jersey
(D.C. Civil Action No. 99-cv-04565)
(Honorable Joseph H. Rodriguez)

———

Argued April 16, 2008

Before:  SLOVITER, JORDAN and ALARCÓN[*],
Circuit Judges

———

[*] Hon. Arthur L. Alarcón, Senior Judge, United States Court
of Appeals for the Ninth Circuit, sitting by designation.

(Filed    June 20, 2008 )

____

David L. Braverman (Argued)
Braverman Kaskey
1650 Market Street
One Liberty Place, 21st Floor
Philadelphia, PA 19103

M. Frances Ryan
James I. Downes
Christopher C. Lund
Dechert LLP
2929 Arch Street
18th Floor, Cira Center
Philadelphia, PA 19104

     Attorneys for Appellants

Richard E. Brennan
Michael O. Adelman (Argued)
Drinker, Biddle & Reath
500 Campus Drive
Florham Park, NJ 07932

     Attorneys for Appellee

Kathleen O. Barnes
Mark A. Sgarlata
Christopher J. Brasco
Christopher M. Anzidei (Argued)
Watt, Tieder, Hoffar
& Fitzgerald, LLP
8405 Greensboro Drive, Suite 100
McLean, VA 22102

     Attorneys for Amicus Curiae - Appellant Construction
     Management Association of America, Inc.

____

OPINION OF THE COURT

---

ALARCÓN, <u>Circuit Judge</u>.

## I

Hill International, Inc. ("Hill") appeals from the denial of a post-trial motion it called a "Motion to Mold the Verdict and Enter Judgment Consistent with the Parties' Written Contract" ("the Motion"). Hill was found liable for negligence and breach of its contract with Wartsila NSD North America, Inc. ("Wartsila"). The jury awarded Wartsila $2,047,952 in damages.

Hill filed its Motion, requesting that the District Court enter judgment in favor of Hill consistent with an exculpatory clause in the Consulting Agreement ("Agreement"). The District Court denied the Motion. First, the District Court concluded that the exculpatory clause was unenforceable under Maryland law. Second, the District Court concluded that the damages awarded by the jury were direct damages, and therefore not barred by the exculpatory clause. We will vacate the order denying the Motion and remand this matter to the District Court for a retrial solely regarding the damages that are due to Wartsila because of Hill's breach of contract.

## II

The events underlying this litigation arose out of a contract entered into by Wartsila and Hill on January 24, 1995. Wartsila, an engineering and construction company, hired Hill, a construction consulting firm, to provide consulting services for the construction of a power plant Wartsila was building in Nejapa, El Salvador ("Project").

In July 1994, Wartsila Diesel, Inc., the predecessor to Wartsila, entered into a contract with Coastal Salvadorian Ltd. ("Coastal"), wherein Wartsila agreed to design, engineer, procure, construct, start up, and test a diesel engine power plant in Nejapa, El Salvador. At the time, Wartsila's business primarily involved

3

the sale and maintenance of diesel engines. Wartsila subcontracted the construction Project to other entities, including Black and Veatch International ("BVI"). The Project quickly fell behind schedule, resulting in numerous disputes between Wartsila, BVI, and Coastal. As a result, Wartsila sought a construction consultant that could provide advice and management for the Project.

On January 18, 1995, Hill submitted a proposal for the consulting position. It recommended that Richard LeFebvre, a Hill senior consultant, be assigned to the Project. Attached to this proposal was LeFebvre's resume, which represented that LeFebvre: (1) had received a B.S. in electrical engineering from Pennsylvania State University ("Penn State") in 1966; (2) had earned a B.A. in business administration from Duquesne University in 1969; (3) had taken courses in business law at the University of North Florida in 1983; and (4) was registered and licensed as a professional engineer in Pennsylvania, New York, and Massachusetts.

On January 24, 1995, Wartsila and Hill entered into a written consulting agreement ("Agreement") that incorporated the January 18, 1995 proposal by reference. Pursuant to the terms of the Agreement, Hill assigned LeFebvre to work as a senior consultant on the Project. The Agreement contained an exculpatory clause,[1] which stated:

---

[1] Hill refers to this clause as both a limitation of remedies and a limitation of damages clause. Wartsila generally refers to the clause as an exculpatory clause, as we will, strictly for convenience and without intending the name to carry any substantive legal implication. The District Court noted that:

> Hill disputed whether the clause is a limitation of remedies clause or an exculpatory clause; however, it suggests that because "even broad exculpatory clauses are routinely enforced under Maryland law," that it is essentially a distinction without difference. (Def's Motion to Mold Verdict, p.12.) Therefore, the Court will refer to the clause at issue in this motion as an "exculpatory clause" for ease of reference and consistency, without reading into that phrase any special meaning.

4

> In no event shall Consultant (Hill) be liable in contract or tort or otherwise to Company (Wartsila) for any lost, delayed or diminished profits, revenues, or opportunities, losses by reason of shutdown or inability to utilize or complete the Project, or any other incidental, special, indirect or consequential damages of any kind or nature whatsoever resulting from Consultant's performance or failure to perform services under this Agreement.

J.A. at 66.

LeFebvre was quickly promoted by Wartsila to the position of Project Manager, and continued to work on the Project as a Hill employee until May 25, 1995. One of LeFebvre's responsibilities was to analyze issues bearing on potential claims and defenses in contractual disputes between Wartsila and BVI. On June 1, 1995, with Hill's approval, Wartsila hired LeFebvre directly as an independent contractor to provide assistance with construction and claims management on the Project.

The Project was not completed on time. In May 1996, Wartsila and BVI entered into arbitration before the American Arbitration Association. The parties made delay claims against one another relating to the fact that the Project was not completed on time, and that Coastal had refused to pay the early completion bonus. Also, each side claimed that it had been forced to spend more money than anticipated on the work of the Project due to the other party's delays.

In August 1997, the arbitration hearings commenced. LeFebvre was a key witness in the proceedings due to his extensive knowledge of the facts underlying the points of contention between the two parties. At a September 8, 1997 arbitration proceeding, LeFebvre was questioned about the academic and professional credentials listed on his resume. Toward the end of the direct testimony, Wartsila became aware that there were questions

---

*Wartsila NSD N. Am., Inc. v. Hill Intern., Inc.*, 436 F. Supp. 2d 690, 694 n.1 (D.N.J. 2006).

regarding LeFebvre's educational and professional credentials when counsel for BVI requested that LeFebvre execute a release for background academic information. Later that day, after the proceedings adjourned, LeFebvre admitted to Wartsila's attorneys that the statements on his resume concerning his business degree from Duquesne University ("Duquesne") were not accurate and that Hill had asked him to overstate the extent of his training at Duquesne.

The next morning, LeFebvre requested and received a revised resume from Hill. It omitted any reference to a business degree from Duquesne or business law courses from the University of North Florida. It also modified the date on which he claimed to have received an electrical engineering degree from Penn State. When the proceedings resumed later that day, BVI's attorneys cross examined LeFebvre regarding the inconsistencies between the two resumes. LeFebvre testified that the revised resume was accurate and truthful. After BVI's counsel exposed LeFebvre's false testimony, Wartsila began its own investigation. By the conclusion of that day's proceedings, Wartsila conceded that it uncovered no evidence that LeFebvre had ever received an engineering degree from Penn State or attended any of the schools listed on his first resume. Wartsila also stated that it found no evidence LeFebvre had been licensed as a professional engineer in either New York, Pennsylvania, or Massachusetts.

Wartsila's counsel withdrew LeFebvre's testimony in light of his perjury. The arbitration panel granted Wartsila a short recess to restructure its case. During that time, the company re-examined materials prepared by LeFebvre and discovered that he had improperly altered original "claim support" documents. Consequently, Wartsila withdrew certain claims. On March 5, 1998, the arbitration panel issued a judgment of $4.65 million in favor of BVI.

On September 22, 1999, Wartsila filed this action against Hill to recoup the losses it sustained because Hill furnished a consultant with a fraudulent resume. In its complaint, Wartsila attributed the size of the arbitration award to LeFebvre's false resume and testimony. Wartsila alleged three causes of action

6

against Hill: (1) negligence; (2) fraud; and (3) breach of contract. The trial commenced on February 14, 2006.

The jury found no fraud but rendered a verdict for Wartsila on the negligence and breach of contract claims in the amount of $2,047,952. Hill then filed its Motion. On June 28, 2008, the District Court denied Hill's motion. The District Court held that the exculpatory clause was unenforceable under Maryland law. The District Court also found, in the alternative, that the damages incurred by Wartsila were direct, not consequential, and thus were not covered by the exculpatory clause. Hill filed a timely appeal of the District Court's decision denying the Motion.

## III

"We exercise plenary review over the district court's legal determinations." *Berg Chilling Sys., Inc. v. Hull Corp*., 369 F.3d 745, 754 (3d Cir. 2004) (citation omitted). Our standard of review is plenary with respect to whether the district court applied the appropriate measure of contract damages in a legal sense. *Id.* (citations omitted).

## IV

## A

Hill contends that the exculpatory clause should be enforced because it does not fall under any of the exceptions to the enforcement of exculpatory clauses under Maryland law. We agree. The District Court erred in determining that the exculpatory clause was unenforceable.

Under Maryland law, "[i]n the absence of legislation to the contrary, exculpatory clauses are generally valid, and the public policy of freedom of contract is best served by enforcing the provisions of the clause." *Wolf v. Ford*, 644 A.2d 522, 525 (Md. 1994). In *Wolf,* the Court of Appeals of Maryland stated:

> It is quite possible for the parties expressly to agree in advance that the defendant is under no obligation of care for

7

the benefit of the plaintiff, and shall not be liable for the consequences of conduct which would otherwise be negligent. There is in the ordinary case no public policy which prevents the parties from contracting as they see fit.

*Id.* (quoting W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 68 (5th ed. 1984)). Three exceptions have been identified where the public interest will render an exculpatory clause unenforceable: (1) when the party protected by the clause intentionally causes harm or engages in acts of reckless, wanton, or gross negligence; (2) when the bargaining power of one party to the contract is so grossly unequal so as to put that party at the mercy of the other's negligence; and (3) when the transaction involves the public interest. *Wolf*, 644 A.2d at 525-26. None of these exceptions is applicable here.

Although the jury concluded that Hill was negligent, there was no evidence that Hill engaged in willful misconduct, such as "intentional harms" or "the more extreme forms of negligence, i.e., reckless, wanton, or gross." *Id.* at 525. At trial, Wartsila argued that Hill violated the Agreement by committing fraud. The jury expressly concluded in its verdict, however, that Hill had not committed fraud. This finding eviscerates any argument that the exculpatory clause should be disregarded because of the nature of Hill's alleged misconduct.[2]

No evidence was presented that the Agreement was the result of undue influence or unequal bargaining power. Hill and Wartsila are multinational corporations that were represented by experienced businessmen and attorneys at the time they signed the Agreement.

We also conclude that the "public interest" exception does

---

[2] It is arguable whether, even in the absence of the exculpatory clause, the contractual responsibility to provide a properly credentialed consultant could be the basis for a negligence claim, but that is not a matter we need to decide on the briefs before us.

not apply to the exculpatory clause. It appears that the District Court relied on this exception in determining that the exculpatory clause was unenforceable. In the Order denying the Motion, the District Court relied on *Kline v. Knight,* No. 2238, 2000 WL 33799690, at *38 (Md. Ct. Spec. App. Dec. 21, 2000), for the proposition that "exculpatory clauses do not operate to bar claims for pure breach of contract."[3] *Wartsila NSD N. Am., Inc. v. Hill Intern., Inc.,* 436 F. Supp. 2d 690, 694 (D.N.J. 2006). The District Court explained:

> At bottom, and as found by the jury, Hill failed to provide Wartsila with the very service it contracted to perform. Despite its language, enforcement of the exculpatory clause would lead to a repugnant result–one that would allow a service provider to reap the benefit of a negotiated agreement in the absence of the bargained-for performance.

---

[3] The District Court's reliance on *Kline* is misplaced because it is factually distinguishable. In *Kline*, the exculpatory clause provided that "the venturers would not be liable for 'their actions in connection with the Joint Venture except in the case of actual fraud, gross negligence or dishonest conduct.'" *Kline*, 2000 WL 33799690, at *40. The *Kline* court found that this provision referred to tort concepts. *Id*. The *Kline* court stated that "if the parties had intended to exculpate themselves from liability for future claims of breach of contract, they were required to make that expressly clear in the exculpatory clause." *Id*. Because the parties in *Kline* did not make it expressly clear that they intended to exculpate themselves from liability for future claims of breach of contract, the court in *Kline* held that the exculpatory clause did not limit the defendant's liability for breach of contract. *Id*. This case is unlike *Kline* because Wartsila and Hill made it expressly clear that they intended to limit their liability for breach of contract. The exculpatory clause provides that "[i]n no event shall Consultant be liable in contract or tort or otherwise." J.A. at 6 (emphasis added). Because Wartsila and Hill made it expressly clear that they intended to limit their liability for breach of contract, *Kline* is distinguishable.

While the Court is aware that unambiguous written contracts should be enforced without regard to the consequences of that enforcement, based on the analysis above, this Court finds that Maryland law will not allow such a clause to be enforced.

*Id.* at 696-97.

In *Wolf*, the court identified transactions that affect the public interest as those involving:

the performance of a public service obligation, e.g., public utilities, common carriers, innkeepers, and public warehousemen. It also includes those transactions, not readily susceptible to definition or broad categorization, that are so important to the public good that an exculpatory clause would be "patently offensive," such that "the common sense of the entire community would ... pronounce it" invalid.

*Wolf*, 644 A.2d at 526 (internal quotation omitted).

"This standard is a strict one, in keeping with our general reluctance to invoke the nebulous public interest to disturb private contracts." *Id.* at 526. The contract between Hill and Wartsila did not involve an essential public service such that the enforcement of the exculpatory clause would be "patently offensive." Nor do we believe that on this record the courts of Maryland would conclude that construction consulting has the same broad public impact as other businesses that have been found essential to the public good, such as innkeepers, public utilities, common carriers, or schools. *See, e.g., Seigneur v. Nat'l Fitness Inst., Inc.,* 752 A.2d 631, 640 (Md. Ct. Spec. App. 2000) (citations omitted) ("NFI does not provide an essential public service such that an exculpatory clause would be 'patently offensive' to the citizens of Maryland. The services offered by a health club are not of great importance or of practical necessity to the public as a whole . . . . Nor is a health club anywhere near as socially important as institutions or businesses such as innkeepers, public utilities, common carriers, or

10

schools.").

Finally and significantly, the exculpatory clause did not deprive Wartsila of the entire benefit of the contract, as the District Court believed. It did not eliminate all contractual damages but instead said that certain types of contractual damages would not be recoverable. In short, the District Court erred in determining that the exculpatory clause was unenforceable.

**B**

Hill also maintains that the District Court erred in determining that the damages awarded by the jury were direct and not consequential. Hill argues that the damages sought by Wartsila are barred by the exculpatory clause because they are "incidental, special, indirect or consequential." The District Court erred in determining that all of the damages sought by Wartsila were direct.

Prior to trial, Hill filed a motion to dismiss, asserting, in part, that the exculpatory clause precluded Wartsila from recovering any damages on the breach of contract claim. The District Court denied the motion to dismiss, but did not resolve the question whether the exculpatory clause was enforceable. The District Court explained that because Wartsila brought a claim for fraud, the Court could not determine at that time whether the exculpatory clause was enforceable. Somewhat at odds with its later conclusion, the Court reasoned as follows:

> On their face, these provisions clearly operate to bar plaintiff's breach of contract claim, since it is not grounded in negligence and the alleged damages do not flow from personal injury or property damages. Under Maryland law, "[i]n the absence of fraud, duress, mistake or some countervailing public policy, courts should enforce the terms of unambiguous written contracts without regard to the consequences of enforcement." *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999). However, when the aggrieved party has shown it was deceived into accepting the contract, contractual limitations on judicial

11

remedies will not be enforced . . . [P]laintiff has stated a claim for fraud. Moreover, plaintiff alleges that defendant's fraud induced it to sign Hill's consulting contract, which incorporated by reference the assignment of LeFebvre to Wartsila's project. Compl. ¶¶ 34-36. Accordingly, the liability limitations in the contract will not operate at the dismissal stage to bar plaintiff's claim for breach of contract.

J.A. at 86-87.

The District Court submitted an instruction to the jury that listed the damages sought by Wartsila. The primary items on this list included the entire amount of the arbitration award paid to BVI, Wartsila's attorneys' fees incurred in connection with the arbitration and subsequent litigation, the fees paid to expert witnesses at the arbitration, the cost of numerous court reporting services used in arbitration, and Wartsila's hotel bills and other expenses relating to arbitration.[4]  J.A. at 254-55. The judge

---

[4] The following is the complete list of the revised damages submitted to the jury:
1. AAA Reporting Co. ($2,943.20)
2. Airflow Sciences Corp ($24,263.23)
3. American Arbitration Association ($62,603.63)
4. Baker, Sterchi, Cowden & Rice's Legal Fees (Kansas) ($60,520.15)
5. W.C. Bakewell (Arbitration) ($1,680.85)
6. Black & Veatch International ($5,500,000.00)
7. Carlton Fields– Florida Law Firm ($4,166.95)
8. Cerquetti, Jeff– Power Plants WDUS ($886.47)
9. Double Tree Hotel Bills ($110,110.27)
10. Eagle Legal Services ($8,172.96)
11. Eduardo Echagarruga ($9,952.76)
12. HDH Construction Consultants ($144,879.75)
13. Michael Hafling (Kansas) ($5,660.55)
14. Huesby & Associates ($57,057.75)
15. A W Hutchinson & Associates, Inc. ($83,959.11)
16. IKON ($3,830.19)

instructed the jury on damages without differentiating between direct or consequential damages. In instructing the jury, the judge stated:

> Now, if you are awarding damages, it should be the full amount of the damages. The percentage question is one of law that's taken care of later. So if there is to be a damage award, you don't reduce it for the percentages, the Court does that. It should simply be the total amount.[5]

Transcript of Record at 102, *Wartsila NSD N. Am., Inc. v. Hill Intern., Inc.*, 436 F. Supp. 2d 690 (D.N.J. 2006) (No. 266). Further, the jury verdict form did not ask the jury to distinguish between damages awarded for breach of contract, fraud, or negligence, or ask the jury to itemize damages. Question ten of the jury verdict form states:

> If you have answered that Defendant's negligence, breach of contract, or fraud was a proximate cause of the damages sustained by Plaintiff, what amount, if any, would fully and fairly compensate Plaintiff?

---

17. Johnson, Allison & Hord, P.A. ($16,634.08)
18. Richard LeFebvre ($298,665.90)
19. Robert Maddox ($2,999.39)
20. McGuire, Woods, Battle & Booth, LLP ($6,752.21)
21. Ober, Kaler, Grimes & Shiver ($254,049.46)
22. Juan Radulovic ($4,089.32)
23. Sable, Makroff & Gusky, P.C. ($420.00)
24. URS Greiner ($36,075.51)
25. XACT Duplicating ($1,039.57)
26. XEROX Corporation ($4,917.35)
27. Chaffe McCall's Legal Bills ($621,976.63)
28. Hill International ($188,917.36)
29. Allen Norton ($1,077.49)
Total: $7,518,502.09

J.A. at 254-55 (previous incorrect calculations omitted).

[5] The percentages referred to pertain to the contributory negligence claim against Wartsila.

J.A. at 257.

The jury awarded $2,047,952 in total damages. In its post-trial Motion, Hill argued that because all the damages were consequential, they were barred by the exculpatory clause. The District Court denied the motion based on its conclusion that the damages awarded by the jury were not consequential. The District Court erred in denying the Motion. Maryland courts hold "that damages which a plaintiff may recover for breach of contract include both those which may fairly and reasonably be considered as arising naturally from the breach (general damages) and those which may reasonably be supposed to have been in the contemplation of both parties at the time of making of the contract (special damages)."[6] *Addressograph-Multigraph Corp. v. Zink*, 329 A.2d 28, 33-34 (Md. 1974). General damages are "damages that would follow any breach of similar character in the usual course of events." 24 *Willston on Contracts* § 64:12 (4th ed. 2002). "Consequential damages . . . include those damages that, although not an invariable result of every breach of this sort, were reasonably foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of a breach." *Id.* "These, too, must be proximately caused by the breach, and the difference is that they do not always follow a breach of this particular character." *Id.*

The Fifth Circuit has addressed the distinction between general and consequential damages in a factually similar case in *Reynolds Metals Co. v. Westinghouse Elec. Corp.*, 758 F.2d 1073 (5th Cir. 1985). In *Reynolds*, Westinghouse Electric Corporation contracted with Reynolds Metal Company to sell the latter a transformer. *Id.* at 1074. The contract price included not just the machinery, but a "competent" service engineer, provided by Westinghouse, who would install it. *Id.* The contract disclaimed

---

[6] The terms "special damages" and "consequential damages"usually are viewed as synonymous. *See* 3 Dan B. Dobbs, *Law of Remedies* § 12.2(3), at 38 (2d ed. 1993) ("[S]pecial damages [are] also referred to as consequential damages and the terms are used interchangeably.").

14

liability for "special, indirect, incidental, or *consequential* damages." *Id.* Westinghouse sent an inexperienced engineer who failed to install the transformer properly. *Id.* at 1075. The equipment later suffered damage, in part as a result of the improper installation. *Id.* Reynolds then sued Westinghouse claiming that it had breached the contract by failing to provide a competent engineer. *Id.* at 1076. Reynolds sought compensation to repair the transformer. A jury found that Westinghouse had breached the contract, and awarded Reynolds the value of the transformer with interest. *Id.* at 1077.

On appeal, Westinghouse objected to the amount of the damages, noting that a provision of the contract disclaimed liability for "special indirect, incidental and consequential damages." *Id.* at 1078. The Fifth Circuit agreed with Westinghouse. It concluded that Reynolds was not entitled to the value of the transformer because that was a consequential damage. *Id.* at 1080. The Court stated:

> We recognize that it was a foreseeable consequence of Westinghouse's breach of contract that the alarm system might fail to detect ground current. It was also foreseeable that this failure might in turn permit burning within the transformer to occur unbeknownst to Reynolds and thus exacerbate the damage done to the transformer if short circuiting occurred. Such foreseeable damages are ordinarily recoverable under an expectancy theory, but they are nevertheless consequential losses and do not reflect the difference-in-value damages attributable to the original breach of contract. The proximate cause inquiry submitted to the jury here therefore cast too broad a net and captured more than those damages compensable under the contract.

*Id.* (citations omitted). The Fifth Circuit concluded that the only damages for which Reynolds could recover was the "fee that would have been charged Reynolds by a competent and properly prepared service engineer less the market value of the services that [the service engineer] provided." *Id.*

Here, as part of a service contract, Hill provided Wartsila

15

with a consultant. The jury found that Hill's actions breached its contract. As indicated by *Reynolds*, the amount paid by Wartsila for LeFebvre's services, less the actual value, if any, of those services, constitutes direct damages. All of the remaining items submitted to the jury in Wartsila's list of damages, though foreseeable, are not the type of damages that "would follow any breach of similar character in the usual course of events." 24 *Willston on Contracts* § 64:12 (4th ed. 2002). Rather, some of the damages submitted to the jury resulted from a long series of contingent events, each one dependent upon specific decisions made by Wartsila based upon the facts and interests before it at the time. Wartsila's damages are more clearly consequential than those in *Reynolds* because, while the damages in *Reynolds* arose immediately upon Westinghouse's breach of contract, Wartsila's damages arose years after the alleged breach and only as a result of numerous intervening acts by Wartsila, including hiring LeFebvre directly as an employee.

The District Court erred in holding that "the damages recovered by Wartsila– including: (1) the costs associated with having the Hill consultant as an integral part of the original arbitration; and (2) the costs associated with re-arbitrating in an attempt to repair the damage caused by losing all testimony associated with the Hill consultant– are direct damages." *Wartsila,* 436 F. Supp. 2d at 701.

The District Court compared the damages awarded to Wartsila to those at issue in *21st Century Properties Co. v. Carpenter Insulation & Coatings Co.*, 694 F. Supp. 148 (D. Md. 1988). In *21st Century Properties*, the plaintiffs brought claims of misrepresentation, breach of contract and breach of express warranty against the defendant after four of the roofs it had installed began to leak. The plaintiffs sought to recover the cost of replacing the defective roof, rather than the cost to repair it. *Id*. at 152. The defendant argued that the exculpatory clause barred the plaintiffs from recovering the monetary damages because they were consequential. *Id* at 152 n.4. The court, construing Maryland law, held that "the cost of replacing the allegedly defective roofs which plaintiffs seek to recover constitutes the direct damage, not incidental or consequential damages, caused by the wrongs

16

alleged." *Id.* (citing *Correlli Roofing Co. v. Nat'l Instrument Co.*, 214 A.2d 919, 921 (Md. 1965)).

The type of damages sought in *21st Century Properties* differs from the damages sought by Wartsila in this case. In *21st Century Properties*, the parties directly contracted for the installation of the faulty roofs, which it sought to replace. In the case at hand, Hill and Wartsila contracted for LeFebvre to provide consulting services on the Project. LeFebvre only provided services under that contract from January 24, 1995 through May 25, 1995. On June 1, 1995, Wartsila hired LeFebvre directly, as an independent contractor, to provide assistance with construction and claims management on the Project. Further, when Hill supplied Wartsila with a consultant, it was not inevitable that two and a half years later, Wartsila was going to engage in arbitration and call LeFebvre as a key witness. Numerous intervening, contingent events occurred within those seven years, including: (1) the fact that the claims between the parties could not be resolved except through arbitration; (2) the fact that those claims were such that LeFebvre's testimony was necessary and would be the centerpiece of the case; (3) the fact that LeFebvre was employed by Wartsila and, thus, available to testify; (4) the fact that LeFebvre committed perjury; and (5) the fact that Wartsila allegedly lost the arbitration as a result. Whether or not these events can fairly be called a foreseeable result of the initial breach, they are not inevitable.

The District Court erred in failing to exclude evidence of "incidental, special, indirect, or consequential" damages. Further, the Court did not ask the jury to identify which portion of its award was based on Hill's breach of contract or its alleged negligence.[7] Thus, we cannot tell from the jury's verdict what portion of its award of damages was based on direct damages and what amount was based on consequential damages. In order to give effect to the exculpatory clause agreed to by these parties, there must be a new

---

[7] Since negligence was excluded by the exculpatory clause as the basis for damages, damages characterized as flowing solely from negligence (which is, again, a matter open to debate, *supra* n. 2) should not have been allowed in any event.

17

trial on the issue of damages.

## Conclusion

We vacate the award of damages. We remand for a trial solely on the amount of damages that should be awarded to Wartsila. The District Court is instructed to admit only evidence of direct damages caused by Hill's breach of contract.