80 A.3d 345

BJ'S WHOLESALE CLUB, INC.

v.

Russell ROSEN, Individually, etc., et al.

No. 99, Sept. Term, 2012.

Court of Appeals of Maryland.

Nov. 27, 2013.

Christopher R. Dunn (Jeffrey T. Brown, DeCaro, Doran, Siciliano Gallagher & DeBlasis, LLP, Bowie, MD), on brief, for petitioner.

Ari S. Casper (Denis C. Mitchell, Stein, Mitchell, Muse & Cipollone, LLP, Washington, DC), on brief, for respondent.

H. David Leibensperger, Esq., Berman, Sobin, Gross, Feldman & Darby, LLP, Towson, MD, for amicus curiae brief of the Maryland Association for Justice.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD and IRMA S. RAKER (Retired, Specially Assigned), JJ.

BATTAGLIA, J.

This case requires us to consider the enforceability of a clause, which contained both an exculpatory provision and indemnification language, in an agreement executed by a parent on behalf of his minor son permitting his son's use of a free supervised play area called the "Incredible Kids' Club" (Kids' Club) offered by BJ's Wholesale Club, Inc. (BJ's), a commercial wholesale retail center at its location in Owings Mills, Maryland. The Kids' Club contained a number of different amusement items, including, for instance, a plastic apparatus called "Harry the Hippo" for children to use while their parents shopped.

To use the Kids' Club, BJ's requires parents to sign an agreement, entitled "BJ's Incredible Kids' Club Rules" mandating usage restrictions [1] and, more pertinent to this matter, also contains an exculpatory clause that provides that:

I hereby acknowledge that the participation in BJ's Incredible Kids Club (the "Play Center") is a benefit offered to me

---

[1]. These rules included, *inter alia*, that the Kids' Club was to be used only by toilet trained children, it was to be used for a maximum of ninety minutes, and that BJ's reserved the right to exclude children from the Kids' Club if it determined that the child had a contagious or communicable disease.

as a part of my BJ's Wholesale Club membership. I further acknowledge that I have read, understood and I voluntarily agree to abide by all of the rules appearing above and/or rules as posted in the Play Center and registration area. In consideration for this service, I, individually and on behalf of my child, do hereby waive, release and forever discharge BJ's Wholesale Club, Inc.; its subsidiaries and affiliates and their respective agents, employees, officers, directors, shareholders, successors and assigns from any and all claims and causes of action of any kind or nature which are in any way related, directly or indirectly, to the use of Play Center which I may have or that hereafter may accrue including any such claims or causes of action caused in whole or in part by the negligence of BJ's Wholesale Club, Inc., its subsidiaries and affiliates, and their respective agents, employees, officers, directors, successors and assigns. I understand that my child is here at my own risk and expense and agree that neither I nor my child will bring any claim or cause of action of any kind or nature against BJ's Wholesale Club, Inc., its subsidiaries and affiliates and their respective agents, employees, officers, directors, successors and assigns.

Immediately below in the same paragraph is found an indemnification clause:

I further agree to indemnify, defend and hold harmless BJ's Wholesale Club, Inc., its subsidiaries and affiliates and their respective agents, employees, officers, directors, successors and assigns from any claims or causes of action of any kind arising from my or my child's use of the Play Center. By placing my signature below, I acknowledge and agree that I have read this agreement, understood all of the terms and conditions contained herein, and that this agreement will be in full force and effect during each of my or my child's visit to the Play Center. This agreement shall remain in full force and effect at all times whether my child is dropped off at the Play Center by me or any one else.

This language appears in smaller font than the remaining agreement, but is printed in bold letters just above the line for the parent or guardian's signature.[2]

On July 17, 2005, Russell Rosen executed the "BJ's Incredible Kids' Club Rules," inclusive of both the exculpation and indemnification clauses, on behalf of his three minor children, including his son, Ephraim Rosen. Approximately fifteen months later, Beily Rosen, his wife, went shopping at the BJ's' Owings Mills location and dropped off then five-year old Ephraim at the Kids' Club where, according to the Rosens' Complaint filed in the Circuit Court for Baltimore County, Ephraim was injured:

7. [T]he play area was under the control and supervision of BJ's and its agents and employees, and BJ's had actual or apparent control of the play area.

8. The play area consisted of a number of different amusement items for children. The entire play area is covered by carpet. In most of the play area, the carpet covers a thick layer of resilient foam padding. In other areas, the carpet was adhered directly to a concrete floor. There were no markings to delineate where the floor was padded and where it was not.

9. On October 22, 2006, Beily Rosen went shopping at BJ's with Ephraim. She left Ephraim in the play area.

10. While in the play area, Ephraim was playing on an elevated plastic play apparatus known as Harry the Hippo.

11. The Hippo was approximately 38″ high at its peak and varied in height along the rest of the structure.

12. The Hippo was placed in such a manner that a child who fell forward would land directly on top of the concrete floor covered by only a thin layer of carpet.

---

**2.** The Rosens have not argued that the Incredible Kids' Club Rules agreement was unconscionable as was discussed in *Walther v. Sovereign Bank,* 386 Md. 412, 430, 872 A.2d 735, 746 (2005).

13. Ephraim fell off the front of the structure landing head first directly on the concrete floor covered only by a thin layer of carpet.

14. Ephraim was crying profusely after the fall. His mother was notified to retrieve Ephraim from the play area.

15. That day Ephraim was taken to Sinai Hospital in Baltimore, Maryland. A CT scan of his head revealed that Ephraim had suffered a large acute epidural hematoma in the right temporal, and parietal convexity with extensive mass effect.[3]

16. Ephraim was transferred to Johns Hopkins in Baltimore, Maryland. There he underwent an emergent, right frontal temporal parietal craniectomy for evacuation of the epidural hematoma.[4] The surgery saved Ephraim's life.

The Complaint plead a cause of action in negligence, asserting that:

17. BJ's had a duty to exercise reasonable care to protect its patrons in the play area from injury.

18. BJ's agents and employees knew or should have known that placing an elevated play structure directly over carpet adhered to a concrete floor would pose a danger to children playing there.

19. BJ's breached its duty of care by placing The Hippo in an area without sufficient padding.

BJ's filed an Answer containing a general denial; after the parties began discovery, BJ's filed a counterclaim against the

---

**3.** According to Stedman's Medical Dictionary, a hematoma refers to a "localized mass of extravasated blood that is relatively or completely confined within an organ or tissue, a space, or a potential space; the blood is usually clotted (or partly clotted), and, depending on its duration, may manifest various degrees of organization and decolorization." Stedman's Medical Dictionary 863 (28th ed.2006). The location of the hematoma, the "temporal" region, is defined as the "surface [region] of the head corresponding approximately to the outlines of the temporal bone." *Id.* at 1667.

**4.** According to Stedman's Medical Dictionary, a craniectomy is an "[e]xcission of a portion of the skull, without replacement of the bone." Stedman's Medical Dictionary 454 (28th ed.2006).

Rosens, alleging breach of contract for failing to indemnify, defend, and hold BJ's harmless pursuant to the indemnification clause.

Thereafter, BJ's filed a motion for summary judgment under Rule 2–501 [5] alleging that no factual matters were in dispute and that, pursuant to our decision in *Wolf v. Ford*, 335 Md. 525, 644 A.2d 522 (1994), the exculpatory clause was valid and barred the Rosens' claims as a matter of law. [6] The Rosens filed an opposition, contending that, among other things, the exculpatory and indemnification clauses were unen-

---

5. Rule 2–501 provides in relevant part:
 (a) **Motion.** Any party may make a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. The motion shall be supported by affidavit if it is (1) filed before the day on which the adverse party's initial pleading or motion is filed or (2) based on facts not contained in the record.
 (b) **Response.** A response to a written motion for summary judgment shall be in writing and shall (1) identify with particularity each material fact as to which it is contended that there is a genuine dispute and (2) as to each such fact, identify and attach the relevant portion of the specific document, discovery response, transcript of testimony (by page and line), or other statement under oath that demonstrates the dispute. A response asserting the existence of a material fact or controverting any fact contained in the record shall be supported by an affidavit or other written statement under oath.
 \* \* \*
 (f) **Entry of Judgment.** The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law. By order pursuant to Rule 2–602(b), the court may direct entry of judgment (1) for or against one or more but less than all of the parties to the action, (2) upon one or more but less than all of the claims presented by a party to the action, or (3) for some but less than all of the amount requested when the claim for relief is for money only and the court reserves disposition of the balance of the amount requested. If the judgment is entered against a party in default for failure to appear in the action, the clerk promptly shall send a copy of the judgment to that party at the party's last known address appearing in the court file.

6. The parties agreed to stay discovery pending resolution of the enforceability of the exculpatory and indemnification provisions, which was ratified in a court order.

forceable, because they violated Maryland's public policy interest of protecting children.

After holding a hearing, Judge Thomas J. Bollinger, Sr., of the Circuit Court for Baltimore County granted summary judgment for BJ's:

> The issue before the Court is one of first impression in Maryland. The question is the enforceability of an exculpatory clause signed by one or more of the parents on behalf of their minor child. The Plaintiffs argue that enforcement of such agreements should be void for being against public policy.
>
> Since Maryland has yet to establish any alternative law for adults who sign exculpatory clauses for their children [the trial court] must use the general rule in determining the validity of [the] agreement. Generally, Maryland Courts will uphold exculpatory clauses that are executed by adults on their own behalf. *Wolf v. Ford*, 335 Md. 525, 535 [644 A.2d 522] (1994). "There are circumstances, however, under which the public interest will not permit an exculpatory clause in a contract[ ]." *Id.* at 531 [644 A.2d 522]. "Public policy will not permit exculpatory agreements in transactions affecting the public interest." *Id.* at 532 [644 A.2d 522]. "The ultimate determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations." *Id.* at 535 [644 A.2d 522].
>
> While this Court recognizes that the Maryland Court of Appeals has intended to create a public interest exception, without further guidance, this Court is not capable of evaluating "the totality of the circumstances" against a "backdrop of current societal expectations." *Id.* Consequently, this Court lacks any ability to pronounce public policy grounds to invalidate the clause that Mr. Rosen signed on behalf of his minor child.

(alteration in original).[7] The Rosens filed a timely notice of

---

7. The Rosens, thereafter, filed a motion to alter or amend judgment pursuant to Rule 2–534, which was denied.

appeal in the Court of Special Appeals, and in a reported opinion, the Court of Special Appeals reversed. *Rosen v. BJ's Wholesale Club, Inc.*, 206 Md.App. 708, 716, 51 A.3d 100 (2012).

In so doing, the Court of Special Appeals struck down the exculpation and indemnification clauses, acknowledging that while our decision in *Wolf* validated exculpatory clauses, "[t]here are circumstances . . . under which the public interest will not permit an exculpatory clause in a contract[.]" *Id.* at 716, 51 A.3d at 105, quoting *Wolf,* 335 Md. at 531, 644 A.2d 522 (alterations in original). Our intermediate appellate court explored authority from our sister states such as that from New Jersey, *Hojnowski v. Vans Skate Park,* 187 N.J. 323, 901 A.2d 381 (2006), and Florida, *Kirton v. Fields,* 997 So.2d 349 (Fla.2008), to bolster its conclusion that an agreement entered into by a parent barring a future negligence claim asserted by a child against a commercial enterprise is unenforceable. *Rosen,* 206 Md.App. at 719–22, 51 A.3d at 107–10. The court further opined that the State has a *"parens patrie* interest in caring for those, such as minors, who cannot care for themselves [that] tilts the scales in favor of invalidating a parent's agreement to release his or her child's future tort claims against 'commercial enterprise[s],' " *id.* at 727, 51 A.3d at 112, quoting *In re Najasha B.,* 409 Md. 20, 33, 972 A.2d 845 (2009), which " 'derive economic benefit from' the provision of their services, [so that] 'they are better able to bear the costs associated with injuries than the children or their families,' as they can 'spread the costs of insurance among [their] customers.' " *Id.* at 728, 51 A.3d at 112, quoting *Hojnowski,* 901 A.2d at 388.

BJ's petitioned this Court for a writ of certiorari, which we granted, to consider:

1. In limiting its analysis and holding to "commercial enterprises," did the Court of Special Appeals incorrectly create a distinction not previously recognized in determining the validity of exculpatory agreements in Maryland?

2. Did the Court of Special Appeals err in both disregarding and misinterpreting Maryland public policy in adopting what it described as the "majority view"?

3. Did the Court of Special Appeals err in applying the same flawed public policy rationale in holding the indemnification clause invalid?[ 8]

*BJ's Wholesale Club v. Rosen,* 429 Md. 528, 56 A.3d 1241 (2012). All of these questions essentially ask us to review the trial court's decision de novo, as only matters of law present themselves. *See, e.g., Uninsured Employers' Fund v. Danner,* 388 Md. 649, 658, 882 A.2d 271, 277 (2005); *Johnson v. Mayor & City Council of Baltimore City,* 387 Md. 1, 6, 874 A.2d 439, 442 (2005). These questions, moreover, require us to consider the contours of our decision in *Wolf,* which held that an exculpatory agreement will be permitted except in certain circumstances, including "in transactions affecting the public interest." *Wolf,* 335 Md. at 531–32, 644 A.2d at 525–26.

Initially, BJ's argues that we should refrain from opining on the enforcement of an exculpatory clause against a minor child in the absence of any legislation prohibiting such clauses, arguing that "declaration of public policy [is] best left to the Legislature." For this proposition, BJ's counsel relied at oral argument on our recent decision in *Warr v. JMGM Group, LLC,* 433 Md. 170, 70 A.3d 347(2013), in which we declined to adopt dram shop liability.[9] That case, however, is inapposite; in *Warr* the Legislature had previously considered, and de-

---

**8.** Because we conclude that the exculpatory provision is enforceable, thereby precluding the Rosens' claim as a matter of law, we do not reach BJ's third question.

**9.** "The term 'dram shop liability' refers to '[c]ivil liability of a commercial seller of alcoholic beverages for personal injury caused by an intoxicated customer.' Blacks Law Dictionary 568 (9th ed.2009). 'Dram shop' is an archaic term for a bar or tavern. Black's Law Dictionary 567. The term 'dram' is an antiquated unit of fluid measurement, equivalent to one eighth of a liquid ounce, used by apothecaries; its use in the phrase 'dram shop' was a result of the fact that taverns often sold hard alcohol by the dram." *Warr v. JMGM Group, LLC,* 433 Md. 170, 173 n. 1, 70 A.3d 347, 349 n. 1 (2013) (alteration in original).

clined to adopt on a number of occasions, the policy the Petitioners in *Warr* sought, while in the present case, as conceded by counsel at oral argument, the validity or lack thereof of exculpatory agreements executed by a parent on behalf of a minor child, has not been considered by the Legislature.

■ An exculpatory clause is a "contractual provision relieving a party from liability resulting from a negligent or wrongful act." Black's Law Dictionary (9th ed.2009). By entering into an exculpatory agreement, "the parties expressly ... agree in advance that the defendant is under no obligation of care for the benefit of the plaintiff, and shall not be liable for the consequences of conduct which would otherwise be negligent." *Wolf,* 335 Md. at 531, 644 A.2d at 525, quoting W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 68, at 482 (5th ed.1984) and citing Restatement (Second) of Contracts § 195 (1981). We have had occasion to address the validity of exculpatory clauses most recently in *Wolf,*[10] determining that "[i]n the absence of legislation to the contrary, exculpatory clauses are generally valid, and the public policy of freedom of contract is best served by enforcing the provisions of the clause." *Id.* at 531, 644 A.2d at 525. We also have opined that exculpatory clauses are to be construed

---

**10.** We first considered the enforceability of an exculpation agreement when executed by an adult on her own behalf in *Eastern Avenue Corp. v. Hughes,* 228 Md. 477, 180 A.2d 486 (1962), in which a tenant sued her landlord for injuries she sustained after tripping over a raised area in the parking lot adjacent to her building. Bertha Hughes had previously executed a lease agreement containing an exculpatory clause, which stated that the landlord would not be held liable for injuries arising from "failure to keep the demised premises in repair." *Id.* at 480, 180 A.2d at 488. After suit was filed, the jury awarded the tenant damages and the trial court denied the landlord's motion notwithstanding the verdict. We reversed, and in so doing, we noted that "[a]lmost all of the courts that have passed on the question have held exculpatory clauses valid," and we were, therefore, "constrained to follow the great weight of authority." *Id.* at 479, 180 A.2d at 488. The General Assembly has subsequently declared that, in the context of landlord-tenant agreements, such exculpatory clauses in leases as void as against public policy. Md.Code (1974, 2010 Repl.Vol.), § 8–105 of the Real Property Article.

strictly, requiring that the language of any such clause "clearly and specifically indicates the intent to release the defendant from liability for personal injury caused by the defendant's negligence." *Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 266, 686 A.2d 298, 304 (1996), quoting *Barnes v. New Hampshire Karting Ass'n*, 128 N.H. 102, 509 A.2d 151, 154 (1986).

 In *Wolf*, after articulating the general acceptance of exculpatory clauses, we elucidated various exceptions to their validity. Persuaded by the rigor of *Winterstein v. Wilcom*, 16 Md.App. 130, 293 A.2d 821(1972), we recognized that there were circumstances in which enforcement of an exculpatory clause could be precluded, the first two being:

> First, a party will not be permitted to excuse its liability for intentional harms or for the more extreme forms of negligence, i.e., reckless, wanton, or gross. *Winterstein*, 16 Md.App. at 136, 293 A.2d at 824; Restatement, Second, Contracts § 195(1); Keeton, *supra*. Second, the contract cannot be the product of grossly unequal bargaining power. "When one party is at such an obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence, the agreement is void as against public policy." *Winterstein*, 16 Md.App. at 135–36, 293 A.2d at 824; Keeton, *supra*.

*Wolf*, 335 Md. at 531, 644 A.2d at 526. The third circumstance precluding enforceability was when a transaction affects the public interest:

> Third, public policy will not permit exculpatory agreements in transactions affecting the public interest. *Winterstein*, 16 Md.App. at 136, 293 A.2d at 824. This last category includes the performance of a public service obligation, e.g., public utilities, common carriers, innkeepers, and public warehousemen. It also includes those transactions, not readily susceptible to definition or broad categorization, that are so important to the public good that an exculpatory clause would be "patently offensive," such that " 'the common sense of the entire community would ... pronounce it'

invalid." *Md.–Nat'l Cap. P. & P. v. Wash. Nat'l Arena,* 282 Md. 588, 606, 386 A.2d 1216, 1228 (1978), quoting *Estate of Woods, Weeks & Co.,* 52 Md. 520, 536 (1879). *Id.* at 531–32, 644 A.2d at 525–26.

"Transactions affecting public interest," under *Wolf* encompasses three distinct categories, two of which are not relevant here, because they were not relied upon by Judge Bollinger in reaching his decision in this matter, those being: public service obligations, *see, e.g., Collins v. Virginia Power & Elec. Co.,* 204 N.C. 320, 168 S.E. 500, 504 (1933) (invalidating an exculpatory agreement between a customer and a telegraph company); *Bowman & Bull Co. v. Postal Tel.–Cable Co.,* 290 Ill. 155, 124 N.E. 851, 852 (1919) (invalidating an exculpatory clause between a customer and a telegraph-service provider); *Reeder v. W. Gas & Power Co.,* 42 Wash.2d 542, 256 P.2d 825 (1953) (invalidating an exculpatory clause between a customer and gas-service provider); and other transactions "so important to the public good that an exculpatory clause would be patently offensive." *Wolf,* 335 Md. at 532, 644 A.2d at 526 (citation and quotations omitted); *e.g., Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.,* 530 F.3d 269 (3d Cir.2008) (applying Maryland law and holding that an exculpatory clause in an agreement between a construction consulting firm and an engineering firm was enforceable because construction consulting is not essential to the public good); *Seigneur v. Nat'l Fitness Inst., Inc.,* 132 Md.App. 271, 284, 752 A.2d 631, 637 (2000) (holding that an exculpatory agreement between a customer and a health club was enforceable because services provided by a health club are "not ... of great public importance nor of practical necessity").

Judge Bollinger, rather, relied upon a final catch-all category of the public interest exception to the validity of exculpatory clause, which he recognized was not easily defined, opining that: "While ... the Maryland Court of Appeals has intended to create a public interest exception, without further guidance, [I am] not capable of evaluating 'the totality of the circumstances' against 'a backdrop of current societal expectations.' " In *Wolf,* we attempted to define the contours of this category

of the public interest exception by dissecting *Winterstein,* in which the Court of Special Appeals had adopted a six-factor test established by the Supreme Court of California in the case of *Tunkl v. Regents of University of California,* 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 444–46 (1963), which held that a transaction affects the public interest when:

[T]he attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Id.* 32 Cal.Rptr. 33, 383 P.2d at 445–46 (footnotes omitted). We declined, however, to adopt the *Tunkl* factors, determining that the "fluid nature of the public interest" renders strict reliance on "the presence or absence of six fixed factors" arbitrary and inappropriate. We recognized, instead, that while the factors may be persuasive to evaluate the public interest, "[t]he ultimate determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of

current societal expectations." *Wolf*, 335 Md. at 535, 644 A.2d at 527.

The concept of "societal expectations," then, was undefined in *Wolf*, as Judge Bollinger noted, as he grappled with its application in this case. Our decision in declining to offer a precise definition, however, was based on our recognition that the "public interest" is an amorphous concept not easily defined. Nevertheless, we agree with the parties and the Court of Special Appeals that, in discerning societal expectations, we should look to relevant statutory and common law. *See Porterfield v. Mascari II, Inc.*, 374 Md. 402, 427, 823 A.2d 590, 605 (2003); *Maryland Nat. Bank v. Comptroller of Treasury*, 264 Md. 536, 549, 287 A.2d 291, 298 (1972).

Section 5-203(b) of the Family Law Article, Maryland Code (1974, 2012 Repl.Vol.) defines globally the role of a parent, providing that "the parents of a minor child ... are ... responsible for the child's support, care, nurture, welfare, and education[.]" Closely associated with these obligations and duties is our long-standing recognition that "parents are presumed to act in their children's best interests," *Boswell v. Boswell*, 352 Md. 204, 240, 721 A.2d 662, 679 (1998), which is evinced throughout our cases, including those involving custody, visitation, and adoption disputes. There are, thus, clear societal expectations set forth in the law that parents should make decisions pertaining to their children's welfare, and that those decisions are generally in the child's best interest.

The societal expectation that parents should make significant decisions pertaining to a child's welfare is manifest in statutes that enable parents to exercise their authority on behalf of their minor child in the most important aspects of a child's life, including significant physical and mental health decisions. Parents are empowered, on behalf of their children to: consent to medical treatment, *see* Section 20–102 of the Health–General Article, Maryland Code (2000, 2009 Repl.Vol., 2013 Supp.); consent to having their children give blood, Section 20–101(b) of the Health–General Article, Maryland Code (2000, 2009 Repl.Vol.); consent to the use of a tanning

device by their child,[11] Section 20–106(b) of the Health–General Article, Maryland Code (2000, 2009 Repl.Vol.); and to authorize another family member to consent to the immunization of a minor child, Section 18–4A–02(a) of the Health–General Article, Maryland Code (2000, 2009 Repl.Vol.). Parents are also empowered to commit a child, under certain conditions, to: a public or private service that provides treatment for individuals with mental disorders, *see* Section 10–610 of the Health–General Article, Maryland Code (2000, 2009 Repl.Vol.), as well as a private therapeutic group home that provides access to a range of diagnostic and therapeutic mental health services. *See* Section 10–923 of the Health–General Article, Maryland Code (2000, 2009 Repl.Vol.).

In addition to empowering parents to make significant health decisions, the General Assembly also has directly enabled parents on behalf of a child to make the most significant decisions pertaining to a child's education and employment. With respect to education, parents may: choose to home school their children, Section 7–301(a)(1) of the Education Article, Maryland Code (1978, 2008 Repl.Vol., 2013 Supp.); and choose to defer compulsory schooling for one year if a parent determines that the child is not mature enough to begin schooling. Section 7–301(a)(2) of the Education Article, Maryland Code (1978, 2008 Repl.Vol., 2013 Supp.). Additionally, Section 7–305(c) of the Education Article, Maryland Code (1978, 2008 Repl.Vol., 2013 Supp.) mandates that a parent meet with a school superintendent in the event that a child is suspended for more than ten days or expelled from school. With respect to a child's employment, a child may not work more than is statutorily permitted without a parent giving written consent, Section 3–211(b)(1) of the Labor and Employment Article, Maryland Code (1999, 2008 Repl.Vol.); and if the minor child is working for the parent, the wage and hour restrictions are not applicable, thereby leaving it to the par-

---

11. A tanning device is defined by the statute as "any equipment that emits radiation used for tanning of the skin, including sunlamps, tanning booths, or tanning beds." Md.Code (2000, 2009 Repl.Vol.), § 20–106 of the Health–General Article.

ent's discretion as to how much the child should work. Maryland Code (1999, 2008 Repl.Vol.), Section 3–403(a)(7) of the Labor and Employment Article.

Parents also are empowered to permit a fifteen to seventeen-year old child to marry, *see* Section 2–301 of the Family Law Article, Maryland Code (1999, 2012 Repl.Vol., 2013 Supp.); to use corporal punishment to discipline their children, Section 4–501(b)(2) of the Family Law Article, Maryland Code (1999, 2012 Repl.Vol.); to apply on behalf of a minor child to the "Address Confidentiality Program," a program designed to ensure that domestic violence victims addresses are kept confidential and from their perpetrators, Section 4–522(a)(2) of the Family Law Article, Maryland Code (1999, 2012 Repl.Vol.); to bring an action on behalf of their minor child parent for unpaid support payments under the Maryland Uniform Interstate Support Act, Section 10–314 of the Family Law Article, Maryland Code (1999, 2012 Repl.Vol.); and to consent to a child obtaining a hunting license. Section 10–301(h) of the Natural Resources Article, Maryland Code (2000, 2012 Repl.Vol.).

From this brief survey of various pieces of legislation, it is clear that parents are empowered to make significant decisions on behalf of their children. The Rosens, though, have asserted that there are significant limitations on parental decision-making apparent in legislation, including Section 5–502(b)(1) of the Family Law Article, Maryland Code (1999, 2012 Repl.Vol.), containing a statement that it is the State's policy "to protect minor children whose care has been relinquished to others," which appears as part of a large regulatory scheme applicable to child and foster care facilities. The policy statement, however, merely recognizes the obvious, that children are vulnerable and are entitled to protection. It does not suggest in any manner, however, that parents are incapable of or limited in contracting on their behalf.

The Rosens also have advanced a number of cases that they assert reflect limitations on parental decision-making, all of which, however, are inapposite to define societal expectations

with respect to a parent's role in contracting on behalf of her minor child. To support their argument, the Rosens assert first the ability of a minor to disaffirm a contract entered into with an adult, as determined in *Schmidt v. Prince George's Hospital,* 366 Md. 535, 553, 784 A.2d 1112, 1122 (2001); the inability to defend on the basis of contributory negligence against children as young as five, as opined on in *Taylor v. Armiger,* 277 Md. 638, 648–49, 358 A.2d 883, 888 (1976); and the prohibition against a parent abdicating her parental responsibilities by contracting away her obligation to support her minor child, as discussed in *Geramifar v. Geramifar,* 113 Md.App. 495, 503, 688 A.2d 475, 478 (1997). None of these cases, however, involve a parent acting on behalf of a minor child, and we, therefore, glean no limitations on parental authority from these decisions.

The Rosens, likewise, posit *McCormack v. Board of Education of Baltimore County,* 158 Md.App. 292, 310, 857 A.2d 159, 169 (2004), as a limitation on parental exculpation, in which the Court of Special Appeals opined that a parent is permitted to assert or waive the psychologist-patient privilege on behalf of her child absent a substantial conflict of interest with the child. *McCormack,* too, has no bearing on this matter; it does not address a parent's right to contract on behalf of her child. The Rosens also rely upon *Grimes v. Kennedy Krieger Institute, Inc.,* 366 Md. 29, 782 A.2d 807 (2001), a case in which we considered whether it was appropriate for children to be used in a potentially hazardous nontherapeutic research study; as we made clear in *Grimes,* though, "[t]he issue in these specific contested cases does not relate primarily to the authority of the parent, but to the procedures of [the researchers] and similar entities that may be involved in such health-related studies." *Id.* at 104, 782 A.2d at 852. The Court of Special Appeals did not rely on these decisions in reaching its decision, nor de we find them persuasive; these decisions do not impose any limitations on a parent's right to contract on behalf of her child.

With specific reference to a child's cause of action and parental authority, Section 6–405 of the Courts and Judicial

Proceedings Article, Maryland Code (1974, 2013 Repl.Vol.),[12] empowers parents to terminate litigation on behalf of their minor children; it provides that "[a]ny action . . . brought by a next friend for the benefit of a minor may be settled by the next friend," [13] which unequivocally affords parents the authority to settle or release negligence claims on behalf of their minor children. *See, e.g., Clark v. Southern Can Co.*, 116 Md. 85, 81 A. 271, 273–74 (1911); *Bernstein v. Kapneck*, 290 Md. 452, 454, 430 A.2d 602, 603 (1981). Section 6–405(b) of the Courts and Judicial Proceedings Article, moreover, provides that "[i]f the next friend is not a parent or person in loco parentis of the child, the settlement is not effective unless approved by the parent or other person responsible for the child," thereby empowering parents with the authority to prevent a settlement.

The language of Section 6–405(a) of the Courts and Judicial Proceedings Article, which permits a parent to settle a child's existing claims without judicial interference, notably, is in stark contrast to other states' statutes and rules that require

12. Section 6–405 of the Courts an Judicial Proceedings Article provides in full:
(a) *In general.*—Any action, including one in the name of the State, brought by a next friend for the benefit of a minor may be settled by the next friend.
(b) *Limitation.*—If the next friend is not a parent or person in loco parentis of the child, the settlement is not effective unless approved by the parent or other person responsible for the child.
(c) *Where no parent or other person responsible.*—If both parents are dead, and there is no person responsible for the care and custody of the child, the settlement is not effective unless approved by the court in which the suit was brought. Approval may be granted only on the written application by the next friend, under oath, stating the facts of the case, and why the settlement is in the best interest of the child. Md.Code (1974, 2013 Repl. Vol), § 6–405 of the Courts & Judicial Proceedings Article. All references to Section 6–405 of the Courts and Judicial Proceedings Article ("Section 6–405") throughout are to Maryland Code (1974, 2013 Repl. Vol.), unless otherwise noted.

13. The language of Section 6–405 originated in the Laws of 1898 and has remained the same over the years: "The next friend . . . who shall have brought any suit at law for the benefit of any infant or infants, shall have authority to compromise and settle said suit and the cause of action[.]" 1898 Md. Laws, Chap. 241.

judicial oversight to settle a child's claim, which form the foundation for cases upon which the cases posited by the Rosens rely. *See, e.g., Cooper v. Aspen Skiing Co.,* 48 P.3d 1229, 1233 (Colo.2002) (noting that pursuant to Colorado statutory law a child's claim can be settled only by court approval or by a conservator,[14] and concluding, therefore, because a parent generally could not release a minor child's existing claim it "makes little, if any, sense to conclude a parent has the authority to release a child's cause of action prior to an injury"); [15] *Meyer v. Naperville Manner, Inc.,* 262 Ill.App.3d 141, 199 Ill.Dec. 572, 634 N.E.2d 411, 414 (1994) (opining that pursuant to its statutory and common law a parent may not settle a minor child's cause of action without court approval,[16]

---

**14.** The Colorado Supreme Court in *Cooper v. Aspen Skiing Co.,* 48 P.3d 1229, 1234 (Colo.2002) observed that a court could ratify a settlement pursuant to Section 15–14–412(1)(b) of the Colorado Revised Statutes Annotated (2001). A Colorado court could also appoint a conservator pursuant to Section 15–14–412(1)(b) of the Colorado Revised Statutes Annotated (2001), and pursuant to Section 15–14–413 of the Colorado Revised Statutes Annotated (2001) a parent was not a minor child's conservator as a matter of right, but rather, only by appointment by the court.

**15.** Significantly, even though a parent's right to terminate an existing claim on behalf of a child is limited in Colorado, its legislature has abrogated the holding in *Cooper,* 48 P.3d 1229 by providing that, "a parent of a child may, on behalf of the child, release or waive the child's prospective claim for negligence." Col.Rev.Stat. Ann. (2010), § 13–22–107. In so doing, the Legislature emphasized the significant role of the parent, declaring "[t]hese are proper parental choices on behalf of children that should not be ignored. So long as the decision is voluntary and informed, the decision should be given the same dignity as decisions regarding schooling, medical treatment, and religious education...." Col.Rev.Stat. Ann. (2010), § 13–22–107(1)(a)(v).

**16.** The Illinois court in *Meyer v. Naperville Manner, Inc.,* 262 Ill.App.3d 141, 199 Ill.Dec. 572, 634 N.E.2d 411, 414 (1994), cited its prior decision in *Mastroianni v. Curtis,* 78 Ill.App.3d 97, 33 Ill.Dec. 723, 397 N.E.2d 56 (1979), for the proposition that a parent may not settle a claim without court approval. The *Mastroianni* court interpreted Ill. Rev.Stat.1963, ch. 3, par. 215, now codified at 755 Ill. Comp. Stat. 5/19–8 (1992), which provided: "By leave of court * * * [a] guardian * * * may compound or compromise any claim or any interest of the ward * * * in any personal estate * * * upon such terms as the court

and concluding, therefore, that "[s]ince a parent generally may not release a minor child's cause of action after an injury, there is no compelling reason to conclude that a parent has the authority to release a child's cause of action prior to the injury"); *Hojnowski*, 901 A.2d at 387 (noting that pursuant to N.J. R.Super. Tax Surr. Cts. Civ. R. 4:44 a parent could not settle a minor child's tort claim without court approval, and opining that the purposes underlying the prohibition against a parent settling a minor child's tort claim after a cause of action accrues apply equally to a prospective waiver of negligence); *Hawkins v. Peart*, 37 P.3d 1062, 1066 (Utah 2001) (noting that pursuant to Utah statutory law a child's cause of action could only be settled if approved by the court or settled by a conservator,[17] and concluding, therefore, that because a parent could not "unilaterally release a child's claims *after* a child's injury . . . a parent does not have the authority to release a child's claims *before* an injury" (emphasis in original)); *Scott v. Pac. W. Mountain Resort*, 119 Wash.2d 484, 834 P.2d 6, 11–12 (1992) (noting that a parent could not settle a minor child's cause of action pursuant to Wash. Sup.Ct. Spec. P.R. 98.16W without court approval, and concluding that "[s]ince a parent generally may not release a child's cause of action after injury, it makes little, if any, sense to conclude a parent has the authority to release a child's cause of action prior to an injury"). Thus, the cases upon which the Rosens rely are inapposite, because parents in Maryland, rather than the courts, are authorized to make decisions to terminate tort claims on behalf of their children pursuant to Section 6–405.[18]

---

directs." *Mastroianni*, 33 Ill.Dec. 723, 397 N.E.2d at 58 (alterations in original).

**17.** The Utah Supreme Court observed in *Hawkins v. Peart*, 37 P.3d 1062, 1066 (Utah 2001) that a settlement must be approved by the court pursuant to Section 75–5–408 of the Utah Code Annotated (1993), or by a conservator pursuant to Section 75–5–410 of the Utah Code Annotated (1993), and that a parent may only be a conservator if appointed by the court pursuant to Section 75–4–410(1) of the Utah Code Annotated (1993).

**18.** This societal expectation is further elucidated in our cases applying Section 6–405, in which we have affirmed a parent's decision to

The Rosens contend, alternatively, that Section 6–405 is without relevance, arguing that a prospective waiver of a negligence claim as exculpation is "fundamentally different" from a release of an existing claim; our intermediate appellate court similarly opined that unlike a release of an existing claim, an exculpatory clause that prospectively releases a party from liability for negligence "may remove an important incentive to act with reasonable care." *Rosen*, 206 Md.App. at 724, 51 A.3d at 110–11, quoting *Hawkins*, 37 P.3d at 1066. The intermediate appellate court also noted other differences between the two types of releases that, ostensibly, justified their limiting parental authority to prospectively waive a claim for negligence:

> [Prospective exculpatory] clauses are "routinely imposed in a unilateral manner without any genuine bargaining or opportunity to pay a fee for insurance," unlike post-injury releases of liability, which "involve actual negotiations concerning ascertained rights and liabilities," and that, "if anything, the policies relating to restrictions on a parent's right to compromise an existing claim apply with even greater force in the preinjury, exculpatory clause scenario."

terminate a claim on behalf of her minor child, even when, as in the matter before the Court, the benefit of hindsight illustrates that the decision to release the child's claim was not in the child's best interest. In *Bernstein v. Kapneck*, 290 Md. 452, 430 A.2d 602 (1981), for example, a five-year-old child was injured in a two-car accident in Bethesda, Maryland and, acting under the authority of Section 6–405, the child's mother settled a tort claim on behalf of the child arising out of the accident for $7,500. It was discovered, thereafter, that the child developed a seizure disorder resulting from a brain injury she had sustained in the accident, and accordingly, the mother sought to set aside the settlement, which had been enrolled as a consent judgment. We declined to set aside the judgment, opining that "society will be best served by adherence to the traditional methodology for interpreting contracts in general," *id.* at 458, 430 A.2d at 606, and interpreted the release to conclude that it clearly and unambiguously released the parties from all injuries known and unknown, and therefore, barred the child's claim. And, although we did not discuss specifically parental rights in *Bernstein*, our adherence to our societal expectation that parents should be able to make decisions to terminate their children's litigation is implicit in our holding.

*Id.* at 724–25, 51 A.3d at 110–11, quoting *Hawkins,* 37 P.3d at 1066.

The policy dichotomy proscribed, however, by the Rosens and the Court of Special Appeals has at its core stereotypes that warrant further exploration by the Legislature, rather than that which should be relied upon in judicial decision-making. The preconceptions utilized are pro hac differentiation[19] not in conformity with any of the schemata delineated empowering a parent to act on behalf of a minor child. Section 6–405 reveals a societal expectation that parents, and not courts, should determine whether to release a child's claim for negligence; superimposing a legislative purpose to exclude prospective exculpation is without foundation.

---

**19.** In fact, there are arguments counter to those proffered by the Rosens and the Court of Special Appeals, as identified in Judge LaVecchia's dissenting opinion in *Hojnowski v. Vans Skate Park:*

There is an important difference between the present pre-injury waiver and [post-injury waivers]. . . . Because the pre-injury setting does not involve the specter of a potential monetary settlement that looms over post-injury settlements, conflicts are of little concern in the pre-injury setting.

*Hojnowski v. Vans Skate Park,* 187 N.J. 323, 901 A.2d 381, 396 (2006) (LaVecchia, J., dissenting). These differences, among others, may justify a more protective rule when a parent settles an existing claim, rather than when she executes a prospective waiver of negligence:

A parent dealing with an existing claim is simultaneously coping with an injured child; such a situation creates a potential for parental action contrary to that child's ultimate best interests.

A parent who signs a release before her child participates in recreational activity, however, faces an entirely different situation. First, such a parent has no financial motivation to sign the release. To the contrary, because a parent must pay for medical care, she risks her financial interests by signing away the right to recover damages. Thus, the parent would better serve her financial interests by refusing to sign the release.

A parent who dishonestly or maliciously signs a preinjury release in deliberate derogation of his child's best interest . . . seems unlikely. . . .

Moreover, parents are less vulnerable to coercion and fraud in a preinjury setting. . . . A parent signing a future release is thus more able to reasonably assess the possible consequences of waiving the right to sue.

Angeline Purdy, Note, *Scott v. Pacific West Mountain Resort: Erroneously Invalidating Parental Releases of A Minor's Future Claim,* 68 Wash. L.Rev. 457, 474 (1993) (footnotes omitted).

The Rosens assert, however, that parental decision-making with respect to a minor child's tort claim is limited by Sections 13–401 *et seq.* of the Estates and Trusts Article, Maryland Code (2001, 2011 Repl.Vol.), requiring, *inter alia*, that tort awards recovered by a minor exceeding $5,000 be placed in trust, and moreover, limits access to those funds for limited reasons, such as educational or medical needs. Section 13–402 of the Estates and Trusts Article clearly states, in reference to Sections 13–401 *et seq.*, that "judgment in tort should be preserved for the benefit of the minor," limiting the parent's use of the settlement or judgment money, but not the authority to terminate a claim.

The Rosens similarly advance Section 5–201 of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2013 Repl.Vol.), as a limitation on parental decision-making with respect to a child's tort claim. Section 5–201 tolls the statute of limitations when a minor has been injured, providing that that a cause of action "accrues . . . within the lesser of three years or the applicable period of limitations after the date the disability is removed." The statute serves to provide a child with an opportunity to pursue a claim upon attaining the age of majority *only if* the child's parent did not pursue the claim on the child's behalf during her minority. A parent continues to have the power to initiate and terminate a suit during infancy.[20] We, therefore, glean no limitations on a parent's right to terminate a minor child's tort claim from these statutes.

■ Now that we have explored societal expectations as discerned by statutory and common law, we turn to the juxtaposition of the instant facts against those expectations.

---

**20.** The Rosens have similarly asserted Section 10–910 of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2013 Repl.Vol.), prohibiting the imputation of the negligence of a parent or a custodian to a minor child and argue that it acts to prevent parental decision-making from barring a minor child's tort claim. This statute acts only to prevent the doctrine of contributory negligence from being asserted against a minor. *See Caroline v. Reicher,* 269 Md. 125, 130, 304 A.2d 831, 834 (1973). It does not, however, limit a parent's decision to terminate a child's claim, as authorized in Section 6–405.

This case involves the decision made by Mr. Rosen to sign an exculpatory agreement on his behalf and that of his children. Our review of our statutes and cases reflect a societal expectation that a parent's decision-making is not limited. The Court of Special Appeals, likewise, did not assert any limitation on a parent's right to prospectively waive a minor child's tort claim. We conclude, therefore, that Mr. Rosen's execution of an exculpatory agreement on behalf of Ephraim to allow him to use the Kids' Club was not a transaction affecting the public interest within the meaning of *Wolf,* which otherwise would have impugned the effect of the agreement.

The Court of Special Appeals's decision, however, rested upon two other considerations aside from the *Wolf* decision. The intermediate appellate court rooted its opinion on a perceived distinction between commercial and non-commercial enterprises, opining that "because commercial enterprises 'derive economic benefit from' the provision of their services, 'they are better able to bear the costs associated with injures than the children or their families,'" because they could better afford to insure against a risk of loss than a non-commercial entity. *Rosen,* 206 Md.App. at 728, 51 A.3d at 112, quoting *Hojnowski,* 901 A.2d at 381. The Rosens have likewise posited this argument, contending that "BJ's, a profitable company, can insure against injuries at its Play Center." The distinction between commercial and non-commercial entities, however, is without support in our jurisprudence; we have upheld the legitimacy of exculpatory agreements in commercial settings against adults and the policy arguments upon which we have validated or invalidated exculpatory clauses know no such distinction. The Court of Special Appeals opined, however, that "a minor child is far less capable of looking out for his own safety and welfare than an adult, a difference which, in [its] view, justifies a more protective rule for children." *Rosen,* 206 Md.App. at 728, citing *Kirton v. Fields,* 997 So.2d 349, 359–60 (Fla.2008) (Anstead, J., concurring).[21] Whether a

---

21. Subsequent to the Supreme Court of Florida's decision in *Kirton v. Fields,* 997 So.2d 349 (Fla.2008), the Florida legislature "limit[ed]

child's judgment renders him less capable of looking out for his own welfare heeds true whether or not he or she is playing on a school playground or in a commercial setting. As we have explained, parents are charged with protecting the welfare of their children, and we will defer to a parent's determination that the potential risks of an activity are outweighed by the perceived benefit to the child when she executes an exculpation agreement.

Whether an agreement prospectively waiving a claim for negligence executed by a parent on behalf of a child should be invalidated because a commercial entity may better be able to bear the risk of loss than a non-commercial entity by purchasing insurance, moreover, is for a matter of legislative fact-finding as well as discussion of the relative balance sheets of a commercial entity and of a self-insurer, such as the State, or a religious organization, such as the Catholic Church, for example. The inherent difficultly of this line drawing was elucidated by Justice Charles Wells of the Supreme Court of Florida in his dissent in *Kirton v. Fields:*

> For example, is a Boy Scout or Girl Scout, YMCA, or church camp a commercial establishment or a community-based activity? Is a band trip to participate in the Macy's Thanksgiving Day parade a school or commercial activity? What definition of commercial is to be applied?
>
> The importance of this issue cannot be overstated because it affects so many youth activities and involves so much monetary exposure. Bands, cheerleading squads, sports teams, church choirs, and other groups that often charge for their activities and performances will not know whether they are a commercial activity because of the fees and ticket sales. How can these groups carry on their activities that are so needed by youth if the groups face exposure to large damage claims either by paying defense costs or damages?

---

[*Kirton's* ] holding by permitting parents to release a commercial activity provider for a child's injuries occurring as a result of the inherent risk of the activity under certain circumstances." *Claire's Boutiques, Inc. v. Locastro,* 85 So.3d 1192, 1199 (Fla.Dist.Ct.App.2012), citing Fla. Stat. Ann. (2010), § 744.301.

Insuring against such claims is not a realistic answer for many activity providers because insurance costs deplete already very scarce resources.

*Kirton,* 997 So.2d at 363 (Wells, J., dissenting). As a result, we do not adopt the commercial, non-commercial dichotomy posited by the Court of Special Appeals.[22]

The decision of the Court of Special Appeals also rested on the exercise of the State's *parens patrie* authority:

"The State of Maryland has a *parens patriae* interest in caring for those, such as minors, who cannot care for themselves and the child's welfare is a consideration that is of transcendent importance when the child might . . . be in jeopardy." *In re Najasha B.,* 409 Md. 20, 33, 972 A.2d 845 (2009) (quotation omitted). Although this quote is drawn from a child-access case, the important public policy it proclaims is broad and certainly applies here, where adults may be jeopardizing the future welfare of their children by signing releases like the one at issue. It is this *parens patriae* interest which tilts the scales in favor of invalidating a parent's agreement to release his or her child's future tort

---

**22.** The Rosens and the Court of Special Appeals place significant emphasis on decisions of our sister courts that have determined that a parentally-executed exculpatory agreement is unenforceable in the commercial setting. *Rosen,* 206 Md.App. at 719, 51 A.3d at 107. As we explained, *supra,* many of these decisions rely on a legal basis not present in Maryland, that being the inability of a parent to unilaterally settle a child's tort claim. *See, e.g., Meyer v. Naperville Manner, Inc.,* 262 Ill.App.3d 141, 199 Ill.Dec. 572, 634 N.E.2d 411, 414 (1994). We have, moreover, explained that the commercial, non-commercial dichotomy also has no basis in Maryland law, and to the extent any policy basis may exist, it is more properly explored by the Legislature. We, therefore, find unpersuasive the decisions of our sister courts that have supported their conclusions based on the commercial nature of the contracting party. *See, e.g., Hojnowski,* 901 A.2d at 388–89. We note, finally, that some of them have enforced a parentally-executed exculpatory agreement in the non-commercial setting, and have supported their holdings on bases other than the non-commercial nature of the activity. *See, e.g., Zivich v. Mentor Soccer Club, Inc.,* 82 Ohio St.3d 367, 696 N.E.2d 201, 207 (1998) (enforcing a parentally-signed exculpatory agreement against a minor child in favor of a non-profit soccer club, opining that the parent "did her best to protect [the injured child's] interests and [the court] will not disturb her judgment").

claims against a "commercial enterprise," even though such an agreement, if executed by the parent on his or her own behalf, may be enforceable.

*Rosen,* 206 Md.App. at 727, 51 A.3d at 112, citing *Wolf,* 335 Md. at 531, 644 A.2d 522. The application of the parens patriae doctrine has generally been invoked only in proceedings where parental rights have been abrogated, pursuant to a statutory scheme, as in CINA cases.[23] *E.g., In re Najasha B.,* 409 Md. 20, 972 A.2d 845 (2009). The State only interjects itself in CINA cases, however, because it is alleged that the parents are unfit or incapable of performing the parenting function. Section 3–801(f) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2013 Repl.Vol.) (defining a CINA as a "child who requires court intervention because . . . [t]he child's parents . . . are unable or unwilling to give proper care and attention to the child and the child's needs"); Section 5–323(d) of the Family Law Article, Maryland Code (1999, 2012 Repl.Vol.) (providing that factors to be considered when terminating parental rights include, among others, parental abuse, parental contact with the child, parental support of the child, and parental disability making her unable to care for the child's needs); Section 5–323(b) of the Family Law Article, Maryland Code (1999, 2012 Repl.Vol.) (declaring that a guardianship petition may not be granted without parental consent unless the Juvenile Court "finds by clear and convincing evidence that a parent is unfit to remain in a parental relationship with the child or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating the rights of the parent is in a child's best interests . . ."). By invoking the State's *parens patriae* authority in the present

---

**23.** "A ' "CINA" means a child in need of assistance' who requires court intervention because: '(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.' [Md.Code (1974, 2006 Repl.Vol., 2008 Supp.)], § 3–801(f) and (g) [of the Courts and Judicial Proceedings Article]." *In re Najasha B.,* 409 Md. 20, 21–22 n. 1, 972 A.2d 845, 846 n. 1 (2009).

matter, the Court of Special Appeals relied on our decision in *In re Najasha B.*, 409 Md. 20, 972 A.2d 845. *In re Najasha B.*, however, only reflects the State's intervention when a parent is unfit or incapable of performing the parenting function, which has not been alleged in the present case.

We have also applied the *parens patriae* doctrine in cases in which we have observed that the juvenile delinquency systems is an "extension of the doctrine of *parens patriae*, [which] viewed juvenile offenders to be in need of protection and rehabilitation rather than punishment." *In re Victor B.*, 336 Md. 85, 90, 646 A.2d 1012, 1014 (1994); *see also In re Johnson*, 254 Md. 517, 529, 255 A.2d 419, 425 (1969); *Ex Parte Cromwell*, 232 Md. 305, 308 192 A.2d 775, 777 (1963). The application of *parens patriae* in the juvenile delinquency context has no relevance to the matter *sub judice*, because the child is not an offender.

We have, thus, *never* applied *parens patriae* to invalidate, undermine, or restrict a decision, such as the instant one, made by a parent on behalf of her child in the course of the parenting role. We conclude, therefore, that the Court of Special Appeals erred by invoking the State's *parens patriae* authority to invalidate the exculpatory clause in the Kids' Club Rules agreement.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY.**

ADKINS and McDONALD, JJ., dissent.

ADKINS, J., dissenting, in which McDONALD, J. joins.

The Majority holds that exculpatory agreements in which parents prospectively waive their child's legal claims arising from a commercial entity's negligence are valid. Relying on *Wolf v. Ford*, 335 Md. 525, 535, 644 A.2d 522, 527 (1994), the Majority bases its decision on a societal expectation, enunciated by Maryland statutes and common law, that parents have the authority to make decisions concerning their child's wel-

fare. In adopting a position held by a minority of states, the Majority has ignored the significant public policy interests in invalidating these prospective exculpatory agreements when a commercial entity contracts with a consumer. Such exculpatory agreements are directly adverse to the interests of minors, and ultimately shift the costs of commercial entities' negligence to families and the State. For these reasons, I respectfully dissent.

In *Wolf v. Ford,* this Court hoped to promote freedom of contract by announcing that we would generally enforce exculpatory clauses. 335 Md. at 535, 644 A.2d at 527. Nevertheless, we recognized three exceptions to enforcement when exculpatory agreements: (1) covered extreme forms of negligence; (2) were a result of unequal bargaining power; or, (3) covered transactions that affected the public interest. *Wolf,* 335 Md. at 531–32, 644 A.2d at 525–26. Concerning the third exception, we declined to adopt the test followed by other states and the federal circuit for when a transaction involves the public interest. *Wolf,* 335 Md. at 535, 644 A.2d at 527. Instead, we announced a totality of the circumstances test based on societal expectations. *Id.* ("The ultimate determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations.").

We did not take the opportunity to define "societal expectations" in *Wolf.* Although the appropriate method for defining the legal concept of "societal expectations" is debatable, I do not quarrel with the Majority's conclusion that "parents are empowered to make significant decisions on behalf of their children." Maj. Op. at 730, 80 A.3d at 354.

Yet when dealing with children, we must keep in mind that circuit courts act as *parens patriae,* and parental authority is subject to judicial determinations of public policy affecting the welfare of minor children.[1] In applying *Wolf* to decide wheth-

---

1. As this Court has explained,

er the exculpatory and indemnification clauses required by BJ's Wholesale Club, Inc. adversely affect the public interest, we bear in mind our *parens patriae* role with respect to minor children.

Although Maryland has not considered the enforceability of exculpatory agreements such as these, many other jurisdictions have done so, and the majority have held them unenforceable. *See Galloway v. State,* 790 N.W.2d 252, 258 (Iowa 2010) ("Like a clear majority of other courts deciding such releases are unenforceable, we believe the strong policy in favor of protecting children must trump any competing interest of parents and tortfeasors in their freedom to contractually nullify a minor child's personal injury claim before an injury occurs."); *see also Kirton v. Fields,* 997 So.2d 349, 356 (Fla. 2008) ("In holding that pre-injury releases executed by parents on behalf of minor children are unenforceable for participation in commercial activities, we are in agreement with the majority of other jurisdictions."), *superseded by statute,* Fla. Stat. Ann. § 744.301 (West); *Woodman v. Kera, LLC,* 486 Mich. 228, 785 N.W.2d 1 (2010) (pre-injury waiver of liability of commercial children's play facility unenforceable); *Doyle v. Bowdoin College,* 403 A.2d 1206, 1208 n. 3 (Me.1979) (parent or guardian cannot release college and directors of summer hockey clinic); *Hawkins v. Peart,* 37 P.3d 1062 (Utah 2001) (parent's release and indemnification of commercial trail guide service violates public policy), *superseded by statute* Utah Code Ann.1953 § 78B–4–203 *as recognized in Penunuri v.*

---

The *parens patriae* jurisdiction of circuit courts in this State is well established. The words *parens patriae,* meaning, "father of the country," refer to the State's sovereign power of guardianship over minors and other persons under disability. It is a fundamental common law concept that the jurisdiction of courts of equity over such persons is plenary so as to afford whatever relief may be necessary to protect the individual's best interests.

*Wentzel v. Montgomery Gen. Hosp., Inc.,* 293 Md. 685, 702, 447 A.2d 1244, 1253 (1982) (citations omitted); *see also In re Adoption/Guardianship of Victor A.,* 386 Md. 288, 300–01, 872 A.2d 662, 669 (2005) ("A parent's right to raise his or her children, however, is not beyond limitation, and there may be countervailing considerations that the State, pursuant to its parens patriae authority, must protect.").

*Sundance Partners, Ltd.,* 301 P.3d 984, 990 n. 43 (Utah 2013); *see also* 75 A.L.R.6th 1 (originally published in 2012) ("The general rule has been stated throughout the years as follows: generally, a parent cannot compromise or release a minor child's cause of action absent statutory authority."). The Court of Special Appeals aptly describes such exculpatory clauses as promoting a "misalignment of incentives," and points out that commercial enterprises are in a better position not only to control their premises and employees, but also to carry insurance against liability for negligence. *Rosen v. BJ's Wholesale Club, Inc.,* 206 Md.App. 708, 725–28, 51 A.3d 100, 111–12 (2012).

In rejecting this majority rule, the Majority places heavy weight on a Maryland statute that authorizes a parent to terminate litigation on behalf of their minor children. Section 6–405(a) of the Courts and Judicial Proceedings Article ("CJP"), provides: "[a]ny action . . . brought by a next friend for the benefit of a minor may be settled by the next friend." Md.Code (1973, 2013 Repl.Vol.). The majority reasons that because Maryland legislation has given parents the power to settle lawsuits for their children, they should also be able to release their children's claims of negligence before any injury occurs.[2] But it fails to grapple with Petitioner's claim that a pre-injury waiver of a negligence claim is "fundamentally different" from a release of a claim post-injury. I agree with Petitioner, and submit that the differences between a pre-injury and post-injury release cannot be overstated. With a pre-injury release, the business that secures the release is immunized from the effects of future negligent conduct. This

---

**2.** To be sure, some out-of-state cases rely on the absence of a right to settle pending litigation as one of the factors supporting their conclusion that such exculpatory clauses are not enforceable. *See, e.g., Scott v. Pacific West Mountain Resort,* 119 Wash.2d 484, 834 P.2d 6 (1992); *Hawkins v. Peart,* 37 P.3d 1062 (Utah 2001). Maryland by statute has granted parents the right to settle litigation on behalf of their children. *See* CJP § 6–405. But, as I explain in the text, I do not view this statutory authorization for parents to settle litigation on behalf of their children, as support for a decision to enforce a pre-injury exculpatory clause.

immunization has a natural tendency to foster negligent practices which are injurious to children. On the other hand, a post-injury release, or settlement of a litigation under CJP § 6–405(b) does not foster negligent practices because the negligent act has already occurred. Moreover, with a post-injury release, the parent is informed of the nature of the negligence, the extent of the child's injury, and is in a position to negotiate. This pre-injury versus post-injury distinction is vitally important, and the Majority, in my view, glosses over it.

I would not extrapolate from CJP § 6–405, as the Majority does, that the General Assembly created a policy that means that a parent can release from all liability a business that promises to care for their children in return for their shopping dollars. Section 6–405 is legislation that promotes the settlement of lawsuits, a longstanding public policy goal. *See Chertkof v. Harry C. Weiskittel Co.*, 251 Md. 544, 550, 248 A.2d 373, 377 (1968) ("Courts look with favor upon the compromise or settlement of law suits in the interest of efficient and economical administration of justice and the lessening of friction and acrimony."). But unlike pre-injury exculpatory clauses, settlement of lawsuits resolves only past conduct, and has little to no impact on an organization's incentive to maintain safe practices and safe premises. In objectively examining the terms of CJP § 6–405, we have no reason to think that the legislature also considered and rejected as unimportant the negative ramifications of parents handing over the care of their children, and giving the caretaker immunity from negligence. In deciding whether businesses who take responsibility for children can immunize themselves from liability for negligence, we should not rest on CJP § 6–405 to delineate policy. Rather, we should note the *absence* of any legislation authorizing parents to sign pre-injury releases for their children. In addition to their fundamental rights to raise their children, parents have been given various rights by statute, but never has the legislature authorized them to execute this type of release.

When the *Wolf* test is properly applied, we look to the totality of the public interests touched by exculpatory clauses.

*Wolf,* 335 Md. at 535, 644 A.2d at 527. Parents are signing away their child's legal right without knowing what injury will befall their child, without equal bargaining strength and without the opportunity to negotiate. *Id.* In cases like this, where the exculpatory clause is signed as part of a membership agreement at a shopping center, parents may not even be fully cognizant of the decision they are making. *Hojnowski v. Vans Skate Park,* 187 N.J. 323, 334, 901 A.2d 381 (N.J.2006) ("[A]t the time a parent decides to release the potential tort claims of his or her child, the parent may not fully understand the consequences of that action[.]") Indeed, at the time that this agreement was signed, one of the Petitioners' children had not yet been born.

If the business entity's negligence leads to injury of a child, the burden of dealing with the aftermath shifts from the responsible tortfeasor to the backs of young families in Maryland, and potentially, the State itself. The Majority does not address this concern, or identify it as a policy interest that should factor into its totality of the circumstances test. In this case, five-year-old Ephraim Rosen allegedly suffered serious injury when he fell off the "Hippo" play apparatus, onto a concrete floor covered only by thin carpet, without the thick foam padding located in most of the play area. As a result, he required emergency transportation and a craniectomy. Assuming the truth of the allegations, the burden for paying for this medical care has shifted from the negligent party, who is in the best position to insure against its negligence, to the victim, or perhaps the hospital, or a governmental entity.

The Majority worries that holding this exculpatory clause unenforceable would negatively impact non-profit entities who provide services for children, and that recognizing an exception for commercial entities would lead to inscrutable line-drawing issues. Maj. Op. at 738–41, 80 A.3d at 359–61. Relying on a dissenting opinion in *Kirton,* 997 So.2d at 363, the Majority posits that the line between commercial and non-commercial entities will be difficult to draw. Maj. Op. at 739–41, 80 A.3d at 360–61. I do not share these misgivings,

because I believe we sit to draw such lines. I am confident that we could do so in a principled manner.

Finally, although the question is a closer one, I agree with the Court of Special Appeals that the same public policy interests that render such exculpatory clauses unenforceable apply with equal force to the indemnification clause. Undoubtedly, the same public policy interests concerning cost-shifting apply. Moreover, the *parens patriae* interest is meant to afford "protection in the law to the rights of those who are unable effectively to protect those rights themselves." *Childress v. Madison County,* 777 S.W.2d 1, 7 (Tenn.Ct.App. 1989). And the same issues that prevent a parent from adequately protecting their children in signing the exculpatory clause—namely, the unequal bargaining position and inability to negotiate—are at play when signing the indemnification clause. I agree with our intermediate court that to hold otherwise "would be contradictory [and] . . . effectively undercut a minor's rights to sue by allowing indemnity clauses that make such suits for all realistic purposes unlikely." *Rosen v. BJ's Wholesale Club, Inc.,* 206 Md.App. 708, 732, 51 A.3d 100, 115 (citing *Cooper v. Aspen Skiing Co.,* 48 P.3d 1229, 1237 (Colo.2002)).

Judge McDONALD authorizes me to state that he shares the views set forth in this dissenting opinion.